OTAHEITE GOLD & SILVER MIN. & MILL. CO. v. DEAN.

(Circuit Court, D. Nevada.  July 2, 1900.)

No. 646.

1. WATER COURSES—RIGHTS OF MILLOWNERS—MINING—POLLUTION OF WATER OF CREEK.

Where there are two ore mills in operation on the same stream, the lower proprietor may be compelled to take some steps and be at more expense than he would if he were the only proprietor on the stream; and it is the duty of the upper proprietor to use great care and caution, and to take such action as will avoid, as far as possible, any injury occurring to the lower proprietor by the flow of tailings from his mill.

2. SAME—INJUNCTION—EVIDENCE.

In making preparations to start up a mill for the reduction of gold and silver ores, which had been idle for a number of years, plaintiff found the water at the settling tank, from which the supply of water for operating the mill was obtained, contained a quantity of tailings, and that after being cleaned out the tailings and débris from above came into the tank in such quantities as might, if continued, prevent the mill from being run. Thereupon plaintiff demanded of defendant, who was operating a mill above the plaintiff's on the same creek, that he prevent his tailings from polluting the water, and was given assurance that by the time he got ready to start up this would be done. At the time this suit was commenced defendant was not discharging tailings or sediment into the stream sufficiently to interfere with plaintiff's using its waters for his mill, and had constructed a series of reservoirs by which he impounded the tailings, and prevented any injurious matter flowing from his mill into the creek. *Held*, that plaintiff was not entitled to an injunction restraining defendant from polluting the stream.

3. SAME.

Defendant's denial in his answer in such case "that he threatened or threatens or intends to dump any tailings or débris from his mill into said stream or water of said creek," does not entitle plaintiff to an injunction against the pollution of the waters of the creek by defendant, on the grounds that the injunction cannot injure defendant under such circumstances, and that plaintiff is entitled to protection against defendant's pollution of such waters in the future.

D. S. Truman, for plaintiff.

Edward J. McCutchen, Henry Mayenbaum, and Torreyson & Summerfield, for defendant.

HAWLEY, District Judge (orally).  This is a suit in equity to obtain a decree enjoining and restraining the defendant from "in any manner using, wasting, obstructing, hindering, delaying, or preventing" the waters of Lewis creek, in Lander county, Nev., from running to, into, upon, and across the lands of complainant, "and to and into the complainant's mill," or from diverting from their usual or natural channel and course, any portion of the same, or "from polluting the same."  The pleadings herein are voluminous, presenting many issues upon which much testimony was offered.  The entire case is, in several of its features, exceedingly interesting, and in many respects important.  Great latitude was allowed both parties in the introduction of their testimony.

In my opinion, the case must stand or fall upon an issue of fact concerning the tailings, and the references made to other issues will

be simply for the purpose of giving a more intelligent and better under-standing, not only of the facts, but also of the contention of counsel and of the circumstances surrounding the case. As a general rule, it may be said that, where there are two mills in operation on the same stream, the lower proprietor may be compelled to take some steps and be at more expense than he would if he were the only proprietor on the stream, and that it becomes the duty of the upper proprietor to use great care and caution, and to take such action as will avoid, as far as possible, within the bounds of reason, any injury occurring to the lower proprietor by the flow of tailings from his mill. It is, among other things, alleged in the complaint:

"That said defendant, as aforesaid, is carrying on the business of mining and milling of ores, rock, and earth of gold, silver, and other metals at a point in said Lewis cañon higher up said stream and water course herein mentioned as Lewis creek, and, in so carrying on and conducting the milling of his said ores, uses the waters of said Lewis creek in so operating said mill; that, by the process of working said ores in use by this defendant, all of the refuse of the ores so worked by said defendant in the operation of his mill becomes what is known as 'tailings,' which, as the ore aforesaid, after being crushed, pulverized, and roasted, and chemically treated, to extract the metals therefrom, and after such extraction of said metals therefrom, said tailings are allowed and permitted by this defendant to escape to and into the waters of said Lewis creek at a point above the lands and mill of this plain-tiff; that, by reason of the said acts of this defendant, the waters of said stream, and the whole thereof, become and are so polluted and contaminated and impregnated with said tailings that the same cannot be used by this plaintiff in its mill boilers for making steam wherewith to run its machinery, or in the working or reduction of its ores, at all, to the great and irreparable injury and damage of plaintiff, and to such an extent that, if permitted to con-tinue upon the part of the defendant, the business of milling ores of this plain-tiff will be greatly impaired or wholly destroyed."

The defendant in his answer admits:

"That he is carrying on the business of mining and milling ores, rock, and earth of gold and silver in said Lewis cañon, and he alleges that he uses the water of the westerly branch of the eastern fork of said creek situated in Pittsburg mining district, in said county and state, on the mountain, at or near the head of said Lewis cañon, which said branch is fed by the water of springs in said mountain, and which said branch and springs are herein designated as the 'Dean Branch and Springs.' The said defendant denies that by any process of working ores by said defendant, all or any refuse of ores worked by him in the operation of his mill, or otherwise, or of any tailings or débris thereof, are by him allowed or permitted to escape to or into the waters of said creek, and into the said alleged lands, mill, or premises of said plaintiff. The said defendant denies that, by reason of any act or acts of this defendant, the waters of said stream, or any part thereof, running into said alleged lands, mill, and premises, become or are in any wise polluted or con-taminated or impregnated with any tailings, or that the same cannot be used by plaintiff in its alleged mill boilers for making steam wherewith to run its alleged machinery, or in the working or reduction of its alleged ores, to the great or irreparable or any injury or damage of plaintiff, or to such an or any extent that, if permitted to continue the alleged business of milling ores by plaintiff, will be greatly or at all impaired, or wholly or partially or at all destroyed. The said defendant denies that he threatened or threatens or in-tends to dump any tailings or débris from his mill into said stream or water of said creek, to flow into or upon said land or mill or premises of said plain-tiff, or to divert said waters of said stream other than the waters of said Dean branch and springs, and denies that the using of said water of said Dean branch and springs by said defendant does in any wise diminish the quantity of water in said creek that would flow on said land, mill, and prem-

ises, or either thereof, of said plaintiff, if the water of said Dean branch and springs were not used by said defendant. *   *   *   And defendant denies that the use by the defendant of the water of said Dean branch and springs in any wise affects the water of said creek for the uses or purposes for which the said plaintiff claims the same in its said bill of complaint."

There are other allegations of the complaint which were evidently drawn upon the theory that the plaintiff was entitled to all the waters of the stream, and to deny the right of defendant to divert any water therefrom for any purpose. These averments were denied in the answer. The testimony shows that, prior to the commencement of this suit, Mr. Thorp, the president and secretary and principal stockholder of plaintiff, visited San Francisco, Cal., and called upon the defendant for the purpose of adjusting the difficulties concerning the water. Upon this point Mr. Thorp testified: "I wanted him, if he would, to impound the tailings, and do it properly, and I would give him a lease for a dollar a year." Upon the refusal on the part of defendant to accept such a lease, this suit was commenced.

The evidence clearly and satisfactorily shows that defendant had a legal right, by appropriation and beneficial use, to the water to the extent required to enable him to properly run and operate his mill. The fact is that both parties are entitled to the waters of the stream for operating their respective mills. This right must be exercised with reference to the general condition of the country and the necessities of both parties, and not so as to deprive the other of its reasonable use. Water in this state is too scarce and valuable, and the necessity of its use in milling, crushing, and reducing gold and silver ores too great, to allow either an upper or lower proprietor, in a case like this, to absorb it all, or to pursue such a course or contend for any doctrine that would prevent its reasonable use by the other, provided it can be used by both, by ordinary care and caution, and without unusual expense, serious detriment, or material injury to either.

It may not be an easy task to define with such clearness as to make it applicable to all cases the rights of mine and mill owners, situated in cañons and ravines through which streams of water flow, who are occupied in extracting the ore from their mines, crushing and reducing the same in their mills, and producing the precious metals therefrom; especially as to the rights of the upper and lower proprietors on the stream, where both parties have an equal right, under the law, to the use of the water of the stream. Perhaps the safest rule would be to cling with pertinacity to the old and oft-repeated maxim, "Sic utere tuo ut alienum non lædas," and hold that such property rights are always subject to it. One thing is certain,—that its application in the present case would preserve the rights of both plaintiff and defendant, and work no injury to either. The defendant in operating his mill is therefore bound to so use the water appropriated by him for that purpose as not to interfere with the rights of the plaintiff in operating its mill by discharging into the stream tailings, débris, or other deleterious matter in quantity or quality which would, to any material extent, injuriously affect the rights of the plaintiff to the water necessary for the purpose of operating its mill.

It is not absolutely essential that water should be perfectly clear and pure in order that it may be used for ordinary milling purposes. If it

were, but few mills could be operated, especially on the banks of the mountain streams like the one in question; for the natural flow of the water over a sandy or loose soil would gather up more or less sediment, while, in the case of heavy freshets, which occur every spring, from the melting of snow in the mountains, rocks, tailings, sand, and other débris will cause more or less inconvenience, detriment, and injury to every quartz-mill owner, whether there are any mills above him or not. No injunction could be broad enough or strong enough to prevent such injury. Equity does not require the water to be sent away from a mill as pure and unadulterated as it was when it left the springs or creek before being used in the mill.

The plaintiff's mill (Highland Chief) is situate about three miles below the defendant's mill. It appears that as early as 1882 there were several mining companies working different mining claims in that locality, in which Mr. Thorp, the president of plaintiff, was interested as an owner or stockholder, and that mills known as the "Highland Chief" and "Eagle" were erected for the purpose of crushing ores from these mines; that the mills were operated for a few weeks in 1882, when they were closed down, and remained idle until 1886, when they were started up and operated in the crushing of ore for a few weeks, and were then again closed down, and, for various causes, remained idle until the summer of 1897; that the plaintiff was incorporated in 1888. The plaintiff failed in its efforts to connect itself by title from the original owners, but did show that it was in possession of the Highland Chief Mill, and some of the other property referred to as having been worked, owned, and operated in 1882 and 1886, under claim of title. The complaint in this suit was filed in the state court July 21, 1897, before the Highland Chief commenced crushing ore in that year.

The testimony on behalf of the plaintiff is, in substance, to the effect that in making preparations, in the spring of 1897, to start up the Highland Chief Mill, the water at the settling tank, above the mill, from which the plaintiff derived its supply of water for the purpose of operating its mill, was found to contain a large quantity of tailings, and, after being cleaned out, the tailings and débris from above came into the tank in such quantities as might, if continued, prevent the mill from being run; that the débris and tailings were of such a character, and came in such quantities, as would be liable to choke up the pipe, and, even if the water flowed to the mill in that condition, its effect would be to form a scale which might cause the boilers at the mill to be burned; that the boilers would be liable to explode; and that it would probably require 50 per cent. more fuel to get up steam. Mr. George, who was then in the employ of plaintiff, in charge of its property, testified that he went up to defendant's mill, and saw Mr. Bousfield, the superintendent of the Dean Mill, and told him "that we thought of starting up down there, and that the tailings were coming down, and asked him if he could do anything to prevent it; and I told him, if they would pipe from the tank house up to the big tree, I thought it would be about 1,500 feet; that we could get clear water for the mill at the lower place, and the tailings would not bother us, and it would not be a great expense. He said, 'Well, you will not be ready to start up until June or after, and by that time the tailings will

not be running down there.' He said, 'It will cost over $1,000 to do that work, and it is too great an expense.' That was about the amount of the conversation we had." Thereafter he served upon Mr. Bousfield the following notice:

"Lewis, June 5, 1897.

"W. E. Dean, per J. D. Bousfield, Agent—Dear Sir: You will take notice that I am ready to make use of the waters of Lewis creek, but, owing to the tailings from your mill in said water, am unable to do so. You will therefore prevent said tailings from polluting said water immediately, or I shall have to take the necessary steps to compel you to do so.

"S. B. Thorp,

"Per E. T. George."

This notice was served more than a month prior to the time when Mr. Thorp visited San Francisco.

On behalf of defendant it was shown that the Dean Mill was erected in 1892, and had been continuously operated since that time, except when stopped, for very short periods, by the inclemency of the weather or inability to obtain men to work; that after the water was used for running the mill it flowed out from the mill, and the tailings were deposited in a reservoir, which would approximately contain about 2,500 tons of tailings; that after the liquid material passed from this main reservoir it went into a second reservoir, capable of holding 100,000 gallons of water; that it passed into a third reservoir, of sufficient size and capacity to settle 50,000 gallons of water, and then passed into a fourth reservoir, which had a capacity of settling 200,000 gallons of water, and from that reservoir the water flowed down into Lewis creek in a practically clear and pure condition, so that it could be used for any purpose, and would not in any manner interfere with the proper working, running, and operating of plaintiff's mill; that the second and third reservoirs were constructed in May or June, 1897, and completed before the bringing of this suit, and the fourth was commenced in July or August, 1897, but not fully completed until after this suit was brought. The Highland Chief Mill was started up in the latter part of July or 1st of August, 1897, and ran a few weeks in August, and again during the months of October and November, and was closed down the last of November, not on account of any difficulty with, or interference from, the tailings in the creek, but from other causes.

From the entire testimony, I find the established facts to be (1) that at the time this suit was commenced the defendant was not discharging tailings or sediment from his mill into the stream to such an extent as to interfere with the use by the plaintiff in its mill of the water flowing down the natural channel of Lewis creek; (2) that the defendant, after using the water from the Dean branch and springs in his quartz mill by means of reservoirs built and constructed by him for that purpose, impounded the tailings so that the waters from said stream when they left the defendant's premises were reasonably fit for use in the plaintiff's mill; (3) that the means used by the defendant to impound the tailings from his mill are ample and sufficient to prevent any injurious matter flowing from his mill into the creek.

There is always more or less light substances, deleterious in their nature, carried in suspension, flowing with the water, which only set-

tles, if at all, when deposited in the settling tank or cribs, and then only where the water is. comparatively still. Annoyance from this source cannot be avoided.

There was a conflict in the testimony as to whether or not the character of tailings testified to by Mr. George was, in quality or extent, such as would materially interfere with the running of plaintiff's mill. It is unnecessary to discuss this question or to decide it. There was a mass of testimony introduced by defendant as to the various causes which had produced the deposit of tailings in the creek below the works of defendant, and above the plaintiff's mill. Among other things, it was shown that several years ago a dam or reservoir had been erected on the banks of the creek for the purpose of saving the tailings from the old Pittsburg mill; that at different times a portion of the waters of the creek flowed over said reservoir, carrying more or less sediment and tailings directly into Lewis creek; that in 1895 or thereabouts a cyanide plant was constructed by the Nevada Reduction Company, and was operated at different times during the years 1895 and 1896, for the purpose of working the tailings; that in the spring of 1897 the reservoir or dam of. said company broke, and a great quantity of tailings from the same was carried down the stream, and deposited above the settling tank from which the plaintiff obtained the water for use in its mill.

It is claimed that the accumulation of the tailings in plaintiff's settling tank can only be accounted for on the theory that the débris and tailings must have come from the defendant's mill, because there were no other parties at that time at work on the stream above the plaintiff's mill. The testimony, when carefully weighed and considered, does not, in my opinion, sustain this theory. There is no positive evidence that the flow of tailings or sediment from the defendant's mill at that time contributed to any appreciable extent to the accumulations of the tailings found in the plaintiff's settling tank.

The plaintiff claims that the defendant, in his answer, having denied "that he threatened or threatens or intends to dump any tailings or débris from his mill into said stream or water of said creek, to flow into or upon said land or mill or premises of said plaintiff," the court ought to grant the injunction prayed for herein, because by so doing the defendant would not in any manner be injured, and because the plaintiff is entitled to be protected, and ought not to be compelled to bring another suit, in the event that the defendant should at any time in the future allow any tailings or débris from his mill and reservoirs to flow into the creek so as to result in injury and damage to the plaintiff. This contention cannot be sustained, under the evidence in this case. It is well settled that a court of equity may grant or withhold its aid according to the particular facts and circumstances of each case. This being true, it naturally follows that its intervention ought not to be procured except by the presentation of a substantial case, where there is a clear and palpable violation of a right. Wherever it affirmatively appears that the plaintiff has been injured or damaged in his rights by the wrongful acts of the defendant, an injunction should be issued. Where some degree of injury has been shown, the court would, naturally, have the right to consider the

probability of its continuance, and many cases might be found where it has been held that, if the injury seems likely to continue, the court may grant an injunction. If there was any satisfactory evidence that defendant had permitted the mud, sand, sediment, or tailings to flow down the stream from his mill in such quantities as to injure the plaintiff in the operation of its mill, and had taken no steps or precaution to prevent such flow, and claimed the right to continue so to do, this court would not hesitate to grant the injunction, although the injury to plaintiff was very slight, if there was a reasonable probability of its continuance or increase. But no authority has been cited which would justify this court in issuing an injunction in a case like this, where no injury has been occasioned, and no reasonable probability that any will occur, on the bare ground that some time in the future the defendant might change his mind, and do some act which might result in an injury to the plaintiff. Let a decree be entered in accordance with this opinion, denying the injunction.