

Opinion delivered January 13, 1906.

1. CONSPIRACY—HOW PROVED.—To establish a conspiracy, it is not neces-
   sary to prove an unlawful agreement by direct and positive evidence;
   if it be proved that two or more persons pursued by their acts the
   same unlawful object, each doing a part, so that their acts, though
   apparently independent, were in fact connected, a conspiracy may be
   inferred, though no actual meeting among them to concert means is
   proved.   (Page 449.)

2. SAME—ACTS AND DECLARATIONS OF CONSPIRATORS.—Any act done, or
   declaration made, by one of the conspirators in furtherance, aid or
   perpetration of the alleged conspiracy may be shown as evidence
   against defendant and his fellow conspirators, upon the principle that,
   by the act of conspiring together, the conspirators have jointly assumed
   to themselves, as a body, the attribute of individuality, so far as regards
   the prosecution of the common design.   (Page·450.)

3. SAME—No evidence of the acts or declarations of a fellow conspirator
   should be admitted against the accused until a *prima facie* case of
   conspiracy is made out, though sometimes the evidence is admitted
   temporarily upon the undertaking of the prosecuting attorney to
   produce proof of a conspiracy later.   (Page 450.)

4. SAME—RES GESTAE.—Testimony of a witness in a prosecution for con-
   spiracy as to what took place at a meeting of the alleged conspirators,
   when defendant was present, which contributed to throw light upon
   the subject of the meeting, was admissible as part of the *res gestae.*
   (Page 452.)

Appeal from Pulaski Circuit Court; EDWARD W. WINFIELD,
Judge; affirmed.

*J. W. & M. House, M. J. Manning, Trimble, Robinson &
Trimble,* and *Murphy & Lewis,* for appellant.

1.   The conspiracy, and that appellant was a party thereto,
should first have been proved, before the acts and declara-
tions of Mayberry and Cook were admissible.  1 Greenleaf on
Ev. (15 Ed.), § § 111, 112; 16 Cyc. 982, 983; 110 Ill. 47; 104
Ind. 70; 51 Iowa, 596; 23 Me. 69; 53 Am. Dec. 134; 12 N. J. Eq.
108; 95 N. C. 377; 9 Humph. 750; 28 Tex. 759; 5 Tex. 211; 6
Whart. 169; 10 Serg. & R. 75; 20 Cent. Dig. Tit. Ev. 815; 20
Ark. 216; 13 Ark. 236; 19 Ia. 517; 122 Mass. 43; 12 Cush. 84;
30 Miss. 656; 92 N. C. 732; 34 Tex. Crim. 424; 28 Tex. App. 189;
8 Cyc. 680.

2.   The evidence was not sufficient to connect the appellant
with a conspiracy, or to establish the existence of a conspiracy.

*Robert L. Rogers, Attorney General,* and *Lewis Rhoton,* for appellee.

1.   A *prima facie* case of.conspiracy was made out, and this was all that was necessary in order to admit the acts and declarations of co-conspirators.   If on the whole testimony it is shown that the conspiracy actually existed, a conviction will be sustained.   105 Cal. 262; 38 Pac. 720; 122 Ill. 1; 17 Kan. 298; 60 Fed. 890, 898; 8 Cyc. 677, *et seq.*; 59 Ark. 422.

*J. W. & M. House, M. J. Manning, Trimble, Robinson & Trimble,* and *Murphy & Lewis,* for appellant in reply.

True, the act or declaration of one conspirator is considered the act or declaration of all, when said or done in furtherance of the common object, but the conspiracy must first be established by evidence *aliunde.*   59 Ark. 422.

BATTLE, J.   The grand jury of Pulaski County, at the March, 1905, term of the circuit court, returned an indictment for conspiracy against George F. Chapline, charging that he and M. D. L. Cook, "in the county of Pulaski and State of Arkansas, on the 25th day of April, 1905, unlawfully combined, conspired, agreed and confederated together, each with the other, to commit the crime of bribery by delivering and paying to senators and representatives who were then and there duly elected, qualified and acting as senators and representatives in the General Assembly of the State of Arkansas, then and there in session, and whose names were unknown to the grand jurors, $1,400, lawful money of the United States, gold, silver and paper money, of the value of $1,400, as, for and by way of a bribe to influence the said senators and representatives, in their official capacity as such senators and representatives, to vote for a bill then and there pending in said General Assembly, being House Bill No. 135, providing for the creation of the Cache River Levee District and the incorporation of a board of directors for said district, and in pursuance of said unlawful combination, confederation and conspiracy induced one A. F. Mayberry, to put up and place in escrow with one Oscar Davis checks and drafts to the amount and of the value of $1,475 with the understanding between the said A. F. Mayberry and them, and Cook, that the said checks and drafts should be cashed, and the money therefor, the sum of

$1,475, lawful money of the United States, gold, silver and paper money of the value of $1,475, should be delivered to them, defendant and said Cook, to be by them paid to the said senators and representatives, as, for and by way of a bribe, for the purpose of influencing the vote and decision of said senators and representatives upon said bill; that defendant and said Cook did not commit said crime of bribery by paying said sum of money or any part of it to the said senators and representatives, or any of them, for and by way of bribes, against the peace and dignity of the State of Arkansas."

The jury impaneled in the case returned a verdict against the defendant, and assessed his punishment at a fine of twenty-five dollars, and he appealed.

The evidence adduced in the trial, and sustaining the verdict, tended to prove, substantially, the following facts:

In March, 1905, there was a bill, known as the "Cache River Levee Bill," pending in the House of Representatives of the General Assembly of the State of Arkansas. On the 11th of March, 1905, it was read in the house the third time, and failed to pass, and a motion to reconsider was made. The defendant, Chapline, was a member of the House, representing Monroe County.

When the motion for reconsideration was pending, N. Perkins, W. B. Williams, A. F. Mayberry, Robinson, Galloway, and other citizens interested in the bill came to Little Rock to see what could be done. It was agreed between them that Mayberry should take a room in the Capital Hotel, in that city, where the friends of the bill could assemble for the purpose of consultation, which he did. A meeting was held in the room, and many were present, among the number those named and the appellant. It continued about two hours. They discussed the merits of the bill. Appellant said "it would require some money to get it through— he thought about $1,000"; and said something about surveying and other expenses. He said it could be placed where it could be used to the best advantage. He was emphatic in saying that he was not to receive a cent of it. He suggested that they select some man to take charge of it. Mayberry was selected. He then said he would put him in touch with a man who would help him. He had a roll of the House and Senate. "He looked over it, called the names of those he had influence with," and marked the

names of those with whom he had no influence with a pencil,
and said some one who had would have to go and see them, and
they would have to get a lobbyist. M. D. L. Cook was then a
reputed lobbyist. Mayberry was to employ the man to assist
them in securing the passage of the bill. The sum of one thou-
sand dollars was to be raised, and it was not to be paid until the
bill became a law. The next morning, at the Capital Hotel,
"appellant waited for some one, he said, * * * who had not
come in." He went to the State House, and looked over the
lobby, and said to Mayberry that he was looking for another
party, but had not seen him. At noon, when he and Mayberry
were talking at the hotel, Cook came along, and appellant stopped
him, and introduced him to Mayberry. After this he said nothing
more about being unable to find that party. When he introduced
them, he said: "This is Mr. Mayberry, Mr. Cook," and May-
berry said to Cook, "You are the man I think I want to see," and
they walked off, and had a conversation. Mayberry told him
what they wanted, and asked him "if he knew everybody, mem-
bers of the Legislature," telling him of "their" condition, that
"they" were strangers, and stating "their" case. Cook then said,
"I know nearly all of them, though I am not a member of the
Legislature, nor a citizen of Little Rock." Mayberry told him
what had occurred at their meeting as to the money, and he
(Cook) said he would see what could be done. Mayberry testi-
fied: "My recollection is that I was lamenting that we had to get
up the money, saying it was unjust, and he said nearly all of these
important bills are passed with the use of money. * * * I
told him what we could do, and he said it would take at least
$1,500." In a subsequent conversation, after the money was
raised, Cook said to Mayberry: "He would be better satisfied
to have the money where he could use it, instead of in my posses-
sion at Cotton Plant. Some one suggested that we leave it here
in Little Rock, which I told him I would do, but that it would be
subject to my order, and if the bill did not become a law, I would
return it. I do not remember whether the suggestion was from
Mr. Cook or Mr. Robinson. One of them suggested Oscar Davis,
and I said he was satisfactory. Robinson and I went down there
and I gave Davis one check, and Robinson gave him one, with
instructions that they were to be paid out to such parties and at

such times as I should name. Cook was not with us. He came in afterwards. I think we told him that we had given Mr. Davis the checks, and that he said it was all right."

The money was to be paid to Cook when the bill became a law. It passed the Legislature, and was vetoed by the Governor; and Davis returned the money to those who paid it.

Williams, who was present at the meeting in Mayberry's room in the hotel, testified in the progress of the trial of this cause, in response to interrogatories, over the objections of appellant, as follows: After testifying as to what occurred at this meeting, he was asked:

"Q. You stated that it was not called for that purpose. I will ask you if, before you left, it didn't change into a meeting the purpose of which was the raising of this money? Was it not apparent that it was for corrupting purposes, and didn't you decline to put up any money for that purpose? I will ask you if it didn't become a meeting for the purpose of raising a fund for corruption?

"A. It was not mentioned as a corruption fund. The question of raising some money to promote the interests of the bill was discussed.

"Q. · Didn't you refuse to put up the money because, as you stated to them, it could be for nothing else but a corruption fund, and didn't you so state in Chapline's presence?

"A. Chapline was present during a part of the meeting.

"Q. While he was there, did you decline to go on, or to participate further in it, because, as you stated to them, it could only be for a corruption fund?

"A. Yes, I made that statement to them.

RECROSS-EXAMINATION.

"Q. What did defendant say when you made that statement?

"A. My recollection is that he said it is not to be used to buy members of the Legislature—that it was to be used as an expense fund. Something was also mentioned about some one having been sent somewhere to get up statistics. No specific purpose for which the money was to be used was mentioned. I asked defendant what the money was for, if it was to be used to pay anybody, and he said it was not a corruption fund, but for expenses. There

had been some talk about boodling, and my object in asking. defendant that question was to make clear to the committee and those present the object of raising the money. Some of them seemed to suspicion, among them myself, that it was for that purpose, boodling, and that is why I asked defendant the question."

We have stated facts which the evidence tended to prove, and which support the verdict of the jury. There are other facts, which evidence adduced tended to prove, which tended to show the innocence of the appellant, but it is not necessary to state them, because the question for us to decide is not, is the appellant innocent? but, was the evidence legally sufficient to sustain the verdict in this court?

Many instructions for the jury were asked and given, and many asked and refused. Those refused, so far as they are correct and proper, were covered by instructions given. It is not necessary to set them out, but, for the purposes of this opinion, it will be sufficient to state the law of the case, so far as relates to them.

The statutes under which the appellant was indicted is as follows: "If two or more persons shall agree and conspire to commit a felony, and make some advance thereto, without committing the felony, they shall be deemed guilty of a misdemeanor." Kirby's Digest, § 1617.

To establish a conspiracy, it is not necessary to prove the unlawful agreement by positive and direct evidence. It may be shown by circumstantial evidence. Mr. Greenleaf states the rule as follows: "Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed in terms to have that design, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object." 3 Greenleaf on Evidence, § 93. This rule is well established by the authorities. 2 Wharton's Criminal Law (10 Ed.), § 1398; 4 Elliott on Evidence, § 2936; Underhill on Criminal Evidence, § 491.

Mr. Underhill states the rule as follows: "Direct evidence is

29

not essential to prove the conspiracy. It need not be shown that the parties actually came together and agreed in express terms to enter in and pursue a common design. The existence of the assent of minds which is involved in a conspiracy may be, and, from the secrecy of the crime, usually must be, inferred by the jury from proof of facts and circumstances which, taken together, apparently indicate that they are merely parts of some complete whole. If it is proved that two or more persons aimed by their acts toward the accomplishment of the same unlawful object, each doing a part, so that their acts, though apparently independent, were in fact connected and co-operative, indicating a closeness of personal association and a concurrence of sentiment, a conspiracy may be inferred, though no actual meeting among them to concert means is proved." Underhill on Criminal Evidence, § 491.

Any act done, or declaration made, by one of the conspirators in furtherance, aid, or perpetration of the alleged conspiracy may be shown in evidence against himself and co-conspirators. The principle "on which they were admitted in evidence against the persons prosecuted," says Greenleaf on Evidence, "is that, by the act of conspiring together, the conspirators have jointly assumed to themselves, as a body, the attribute of individuality, so far as regards the prosecution of the common design; thus rendering whatever is done or said by any one in furtherance of that design a part of the *res gestae,* and therefore the act of all. It is the same principle of identity with each other that governs in regard to the acts and admissions of agents when offered in evidence against their principals, and of partners, as against the partnership." 3 Greenleaf on Evidence, § 94; 4 Elliott on Evidence, § 2939; Underhill on Criminal Evidence, § § 492, 493; *Clinton v. Estes,* 20 Ark. 224, 225; *Lawson v. State,* 32 Ark. 220; *Gill v. State,* 59 Ark. 430.

No evidence of the acts or declarations of a conspirator should be admitted against the accused "until the fact of conspiracy with them," says Greenleaf, " is first shown, or until at least a *prima facie* case is made out either against them all, or against those who are affected by the evidence proposed to be offered; and that, of the sufficiency of such *prima facie* case to entitle the prosecutor to go into other proof, the judge, in his discretion, is to determine. But this, like other rules in regard to the *order* in

which testimony is to be adduced, is subject to exceptions, for the sake of convenience; the judge sometimes permitting evidence to be given, the relevancy of which is not apparent at the time when it is offered, but the prosecutor or counsel shows will be rendered so by other evidence which he undertakes to produce." *Lawson v. State,* 32 Ark. 220; *Gill v. State,* 59 Ark. 430; 3 Greenleaf on Evidence, § 92; 4 Elliott on Evidence, § § 2940, 2941; Underhill on Criminal Evidence, § 492.

The Cache River Levee Bill was defeated the first time on its passage in the house by a vote of forty-two against to seven in favor of it. Then it was its friends became active in its support, and held a meeting in Mayberry's room in the Capital Hotel to determine what should be done to secure its passage. Appellant was present, took an active part in its proceedings, said it would require money to get it through—he thought about $1,000—and suggested that some one be selected to take charge of it. He said that some one would have to see certain members of the House, and that they ought to get a lobbyist for that purpose. Mayberry was selected to take charge of the money, when raised, and to employ some one to assist in securing the passage of the bill. When this was done, appellant proposed to put Mayberry in touch with a man who could do them much good, and he did so by introducing him to Cook. The money was not to be paid until the bill became a law.

Why suggest that $1,000 be raised to secure the passage of the bill? The bill had been defeated by a large majority when it was first put on its final passage in the House. It was then known that a large majority in that body was opposed to it. Something had to be done to overcome this majority. How was that to be done? The money was not to be paid until it became a law. The consideration of the payment was to be the enactment of the bill into a law. The jury might have inferred that it was to be used to influence members of the Legislature to support it. This conclusion is supported by the fact that appellant suggested that some one be employed to see certain members of the Legislature, and that he be a lobbyist. When Mayberry was selected to take charge of the money, with authority to control it, he said that he could put him in touch with a man who would be of great service, and did so by introducing Cook. Why did he do so? The

jury could have inferred that it was for the purpose of securing his employment to carry into effect the object of raising the money. Such object and the selection of the man should be considered together to determine the object of his employment. There is reason to believe that he knew that Cook could be employed for such purpose, and had previously acquired such information from him, and in so doing informed him of his object. If this be so, it occurred before the meeting in the Capital Hotel; for it was there appellant said he could place Mayberry in touch with a man who could be of service, obviously meaning Cook. Why should he be seeking such information and informing Cook of the object of it? What followed the meeting in the Capital Hotel explains. From this the jury could reasonably have inferred that he promised Cook to do what he did, and Cook agreed to accept the employment if it was tendered. Here is *prima facie* evidence of the conspiracy. What followed confirms it. When Mayberry was introduced to Cook, he said to Cook, "You are the man I think I want to see." Then followed a conversation in which Mayberry complained of the necessity of having to raise money to secure the passage of the "Cache River Levee Bill," when Cook replied by saying that "nearly all of these important bills are passed with the use of money," and that it would take at least $1,500 to secure the passage of the bill. Fourteen hundred and seventy-five dollars were raised; Cook was employed, and by consent it was delivered to Oscar Davis to be paid to Cook, on the order of Mayberry, when the bill became a law.

The testimony of W. B. Williams that was objected to by appellant was competent. The meeting in Mayberry's room was an important link in the conspiracy, and what Williams testified occurred was a part of the proceedings thereof when appellant was present, and was a part of the *res gestae,* and contributed to throw light upon the object of it, as understood by some of those present and taking part in its proceedings.

Judgment affirmed.