POWELL *v.* STATE.

Opinion delivered April 15, 1918.

1.  CONSPIRACY—EXTORTION OF MONEY—INTRODUCTION OF BILLS IN
    STATE LEGISLATURE.—An indictment charged that appellant and
    one B. did unlawfully, etc., agree, conspire, combine and confederate
    together, each with the other and with other persons, to introduce
    and cause to be introduced in the Senate of the General Assembly of
    the State of Arkansas, two certain bills (naming them) for the sole
    purpose of corruptly, etc., demanding and extorting money from
    persons interested in the manufacture and sale of certain articles.
    *Held*, the indictment charged the crime of a conspiracy to defraud
    a certain class of persons by extorting money from them in the
    manner alleged.

2.  CONSPIRACY—EXTORTION OF MONEY—MISDEMEANOR.—The crime
    charged in the indictment summarized above, held to constitute a
    misdemeanor at common law, and that same had not been repealed
    by statute.

3.  CRIMINAL LAW—CONSPIRACY—PLEA OF GUILTY.—Appellant was
    charged with conspiring with one B. and others to extort money from
    certain parties; appellant's case was called, but before a jury was
    selected one of the attorneys for the prosecution announced that B.
    had plead guilty; *held*, there was no error in permitting the attorney
    to make the remark, the same being followed up by an actual plea of
    guilty by B.

4.  CRIMINAL LAW—CONSPIRACY—TESTIMONY—AGENT OF ACCUSED.—In
    a prosecution for a conspiracy between defendant and others to
    extort money from certain persons by the introduction of certain
    bills into the State Legislature, statements by witnesses that one P.
    told them of the plan to extort money, held admissible, the proof
    showing P. to have been defendant's agent in the transactions, and
    the jury being properly instructed by the court with reference to the
    same.

5.  CRIMINAL LAW—CONSPIRACY—EXTORTION OF MONEY.—In a prosecu-
    tion of defendant for conspiracy with others for the extortion of
    money by the introduction of certain bills in the State Legislature,
    proof that defendant rented certain rooms in a hotel, and maintained
    the same as a lobby, is admissible, and also proof of who visited the
    rooms and the transactions that took place there.

6.  CONSPIRACY—PROOF.—Proof of a conspiracy may be by circum-
    stantial evidence.

7.  CONSPIRACY—PROOF—TESTIMONY OF GRAND JURORS.—In a prose-
    cution for conspiracy, the State introduced the clerk of the grand jury
    to prove that there were certain persons connected with the con-
    spiracy, whose names were unknown to the grand jury. *Held*,

thereafter it was proper for the court to refuse to permit defendant to put all the grand jurors on the stand in the absence of a disclosure of what he expected to establish by them.

8. CONSPIRACY—PROOF.—Proof of the actual meeting of alleged conspirators is not necessary; it is sufficient if two or more persons aimed their acts toward the accomplishment of the same unlawful purpose.

Appeal from Pulaski Circuit Court, First Division; *John W. Wade*, Judge; affirmed.

*W. H. Pemberton* and *Chas. Jacobson*, for appellant; *W. N. Ivie*, of counsel.

1. The demurrer should have been sustained. The indictment is not sufficient under the statute, nor good at common law. Kirby's Digest, § § 1617-1602; 47 Ark. 572; 93 *Id*. 81; 43 *Id*. 93; 47 *Id*. 572.

2. Mr. Rhoton's statements before the jury that Burgess desired to plead guilty was prejudicial. 197 S. W. 861.

3. Incompetent evidence was admitted as to drinking, gambling, loud noises, etc., in rooms 404-406. 72 Ark. 586; 83 S. W. 196; 174 *Id*. 567; 161 *Id*. 190; 87 Ark. 17; 179 S. W. 159. See also 130 Ark. 245; 140 S. W. 139; 159 *Id*. 36; 187 *Id*. 483; 179 *Id*. 159; 137 *Id*. 1079; 95 *Id*. 515; 91 Ark. 555; 130 Ark. 365. Peebles', Leiser's and others' testimony was not competent.

4. The indictment charges defendants with conspiring with other persons, etc., whose names were unknown to the grand jury, etc. This was descriptive of the offense, and there is variance between the allegation and proof. It was error to exclude the evidence of the grand jurors. It was material. See 5 Mont. 565; 115 Ala. 83; 80 Ark. 94; 96 S. W. 125; 14 R. C. L. 182; 111 Mass. 395; 61 Pac. 828; 141 Ill. App. 170; 156 U. S. 432.

5. Reviews the instructions given and refused and contends that there was prejudicial error. 87 Ark. 34. The court did not correctly define conspiracy.

6. Burgess was guilty of perjury. There was neither positive nor circumstantial evidence of conspiracy.

*John D. Arbuckle,* Attorney General, and *T. W. Campbell,* Assistant, for appellee.

1. The demurrer was properly overruled. The indictment was good. Kirby's Digest, § 1617. It alleges a conspiracy under the common law. 2 Wharton Cr. Law, § 1379; 2 McClain Cr. Law, § 962; 5 R. C. L. 1083, § 30; *Ib.,* § 27; Kirby's Dig., § § 624, 1617, 2448, etc.

2. There was no error in permitting Burgess to plead guilty. The trial was not in progress. 197 S. W. 861 is not in point.

3. There was no prejudicial error in the admission of evidence.

4. It was not error to refuse to allow defendant to put every member of the grand jury on the stand. No proper showing was made, and no proper offer made. 57 Ark. L. R. 369; 73 Ark. 407. But the burden was on defendant to disprove the allegations that the names of the other persons were unknown to the grand jury. 156 U. S. 432; 16 Neb. 670; 61 Pac. 828. He had rested his case and there was no abuse of discretion by the court.

5. The instructions given correctly state the law. 77 Ark. 444; 2 Wharton Cr. Law (10 ed.) § 394; 4 Elliott on Ev. § 2936; Underhill on Ev. § 491.

6. The court did not err in refusing the instructions asked by defendant. 87 Ark. 34.

WOOD, J. Appellant was convicted of the crime of conspiracy. His punishment was fixed at a fine of $100 and imprisonment one day in the county jail. From the judgment of conviction he appeals to this court.

The indictment, omitting formal parts, is as follows: "That the said Walker V. Powell and I. C. Burgess did unlawfully, wickedly, wilfully, maliciously, knowingly and corruptly agree, conspire, combine and confederate together each with the other and with divers persons whose names are unknown to these grand jurors to induce and cause to be introduced in the Senate of the General Assembly of the State of Arkansas, then and there, in session in pursuance of law, two certain bills, towit:

"Senate Bill No. One Hundred Six, being a bill to create a new additional school revenue and to place a tax upon all carbonate or soft drinks, such as Bevo, Tablo, Just-Right, Golden Seal, Blue Ribbon, Temp Brewing, Coca Cola, Soda Pop and all other drinks and extracts and preparations for making such drinks; and

"Senate Bill No. Three Hundred Forty-Four, being a bill to create an additional revenue for the State and to place a tax upon Bevo, Tablo, Just-Right, Golden Seal, Blue Ribbon, Tampo, Coca Cola and other drinks, made of same or like ingredients, for the sole purpose of corruptly, wickedly, maliciously and unlawfully demanding and extorting money of value from persons interested in the manufacture and sale of said drinks and affected by the passage of said bills and their enactment into law."

The sufficiency of the indictment was challenged by demurrer and by motion in arrest of judgment.

(1-2)    The indictment is not couched in language sufficient to charge the crime of conspiracy to commit a felony under section 1617 of Kirby's Digest, which provides "If two or more persons shall agree and conspire to commit any felony and make some advance thereto without committing a felony, they shall be deemed guilty of a misdemeanor."

The indictment does not contain words sufficient to charge a conspiracy to bribe. It does not charge that Powell and Burgess conspired together to "directly or indirectly promise, offer to give, or procure to be promised, offered, or given, any money, et cetera, to any member of the General Assembly of the State of Arkansas with the intent to influence his vote or decision in any matter brought before him in his official capacity." Nor is the language used sufficient to charge that they had conspired to have some member of the General Assembly receive, and had caused such member to receive, any money, et cetera, to influence his official conduct. In other words there is nothing in the language of the indictment to justify the conclusion that Powell and Burgess had conspired together to commit the crime of

bribery, as that crime is defined under section 1602, Kirby's Digest. If the language of the indictment were sufficient to charge a conspiracy to commit the crime of bribery it would still not be sufficient to charge the statutory offense of conspiracy to commit a felony because it contains no allegation that the felony was not committed, which allegation is essential under the ruling of this court in *Elsey et al.* v. *State,* 47 Ark. 572.

Learned counsel for the appellant contend that prior to the year 1607, which was the fourth year of the reign of James I, that a conspiracy to extort money was not an offense at the common law. They furthermore contend that if there was such an offense under the common law that the same has been abrogated by our statute contained in the chapter on ''Conspiracy,'' Kirby's Digest, secs. 1617-1619, inclusive.

During the reign of Edward I (1239-1307) a statute was enacted defining conspirators. 33 Edw. I, St. 2. Speaking of this statute in *O'Connell* v. *Reg.* 11 Cl. & F. 155-233, Lord Chief Justice Tindal says, ''It speaks of conspiracy as a term at that time well known to the law and professes only to be a definition of conspirators.'' ''That conspiracy,'' says he, ''was an offense known to the common law and not first created by the statute of 33 Edw. I, is manifest.''

In *State* v. *Buchanan et al.,* 5th H. & J. 317, 9th Amer. Dec. 534, it is held (quoting syllabus), ''An indictment will lie at common law * * * for a conspiracy to extort money from another * * * for a conspiracy to cheat and defraud a third person accomplished by means of an act which would not in law amount to an indictable cheat if effected by an individual; for a malicious conspiracy to impoverish or ruin a third person in his trade or profession; for a conspiracy to defraud a third person not *per se* unlawful and though no person be thereby injured.''

''There can be no doubt,'' says Mr. Hawkins, ''but that all confederacies whatsoever, wrongfully to prejudice a third person, are highly criminal at common law;

as where divers persons confederate together by indirect means to impoverish a third person.'' 1 Hawkins P. C. p. 466.

''Conspiracy is the corrupt agreeing together of two or more persons to do by concerted action something unlawful either as a means or an end.'' 2nd Bishop N. Cr. L., sec. 174, p. 98; 2 Wharton Cr. L., p. 1600; 2 McLain Cr. L., p. 157

Sir James Fitzjames Stephen in his digest of the Criminal Law of England (p. 277, art. 336) says: ''Every one commits the misdemeanor of conspiracy who agrees with any other person or persons to do any act with intent to defraud the public or any particular person or class of persons, or to extort from any person any money or goods. Such a conspiracy may be criminal although the act agreed upon is not in itself a crime.''

A conspiracy of the character charged in this indictment was indictable and punishable at the common law as a misdemeanor. 1 Russell on Crimes, 202-203. Wharton's Criminal Law, *supra.*

''All confederacies wrongfully to prejudice another are misdemeanors at common law, whether the intention is to injure his property, his person, or his character.'' 3rd Chitty Cr. L., 1139.

We conclude, therefore, that the offense of which the appellant has been convincted was a misdemeanor at the common law, and that the common law is in force in this State unless the same has been repealed by our statute on conspiracy, *supra.* See secs. 6023-24, Kirby's Digest.

Our statute on conspiracy provides as follows:

''Sec. 1617. If two or more persons shall agree and conspire to commit any felony, and make some advance thereto, without committing the felony, they shall be deemed guilty of a misdeameanor.

''Sec. 1618. If two or more conspire to cheat any person out of any money or other property by false pretenses or false tokens, and make some advance thereto, they shall be deemed guilty of a misdemeanor.

"Sec. 1619. If one or more persons shall contrive and intend to have any person indicted on any false criminal charge, and make some advance thereto, although such person may not be indicted, he or they shall be deemed guilty of a misdemeanor."

It is manifest that it was not the purpose of the Legislature, except in the particulars therein named, to repeal the provisions of the common law concerning conspiracies. Conspiracies at the common law not named or covered by our statute are not repealed by necessary implication. There is no language in the above provisions to warrant the conclusion that the Legislature intended these as a substitution for the entire catalogue of common law conspiracies.

If the Legislature had intended by the particular conspiracies named to repeal all others or to have these substituted for other common law conspiracies not named, it doubtless would have done so in express terms.

Mr. McLain says: "Although both in England and in this country there are statutes defining conspiracies in general, and also making particular forms of combinations criminal as conspiracies, yet these statutes are deemed not to abrogate the common law as to conspiracies unless plainly so intended, and common law conspiracies are therefore, as a rule, still punishable in the various States. 2 McLain's Crim. Law, § 955.

Our statute, sec. 1618, *supra,* making it a misdemeanor to conspire to cheat any person out of any money or other property by false pretenses or tokens does not cover all the ground of common law conspiracies to defraud.

The indictment correctly charged appellant with the crime of conspiracy to defraud a certain class of persons by extorting money from them in the manner alleged. In an indictment for statutory conspiracies it is necessary to allege some overt act done in the pursuance of the conspiracy but such is not the case in an indictment for a common law conspiracy. 5 R. C. L., p. 1081, sec. 27.

There was no error, therefore, in overruling the demurrer and motion in arrest of judgment.

(3) Before the jury was impaneled and sworn, Louis Rhoton, who was assisting the prosecuting attorney, announced in the presence and hearing of the members of the regular panel that Burgess desired to plead guilty but preferred to wait until his attorney could be present. Appellant's attorney objected to this statement.

Rhoton informed the court that such was his information. Thereupon the court required Burgess to state, if such were his desire and he then entered his plea of guilty and sentence was postponed until his attorney could be present. Exceptions were duly saved to the statement of Rhoton, but no exceptions were saved to the ruling of the court in permitting Burgess to enter a plea of guilty.

There was no error in the remarks of the attorney, especially since the remarks were followed up by the plea of guilty entered by Burgess. The jury had not then been impaneled and sworn to try appellant's cause, but even if it had been a voluntary plea of guilty, at that stage of the proceedings, it was certainly no more prejudicial to appellant's cause than was the sworn testimony of Burgess before the jury detailing his participation in the alleged conspiracy.

(4) The court over the objection of appellant permitted witnesses who were in the soft drink business to testify that one Ben Peeples told them in substance that there was the strongest lobby in room 404, Marion Hotel, that was ever established in the State; that they made up their minds to shake $5,000 out of the Coca Cola people, $5,000 out of the Anheuser-Busch people and that there was no escape from it and that they could kill or pass any bill that came along; that Peebles asked witnesses to see Powell, telling them that Powell could save these bills; that it would take a few hundred dollars and that it was due the citizenship of the State to kill the bill.

Appellant contends that there was no testimony in the record to show that Peebles was his agent or author-

ized to represent him in the declarations made to these witnesses and that their testimony therefore as to what Peebles told them was purely hearsay and incompetent.

Witness Leiser, in this connection testified in part as follows: "Mr. Bellingrath met me in the prosecuting attorney's office, and we went over to the Marion Hotel, and paged Mr. Peebles. I had never met Mr. Peebles, but Bellingrath had. We paged Peebles, and the clerk informed us that Mr. Peebles wasn't registered at the Marion. We then paged Powell, and Mr. Powell came over to the desk. I introduced myself, and I introduced Mr. Bellingrath, and told him that we had understood that Peebles wanted to handle this bill, and he was out, and he had mentioned Mr. Powell's name, that Mr. Powell would handle this matter, and we wanted to talk to him, Mr. Powell states, 'Well, that's all right. Mr. Peebles is a friend of mine, a fine fellow. What is the bill?' I showed him a copy of it. * * * He said * * * 'Well, this is another one of those revenue measures, etc.' "

Burgess after testifying that he and appellant had discussed certain soft drink bills which they intended to have introduced in the Legislature, stated that he got a copy of the Bevo and Coca Cola bill and appellant looked it over and said, "It is a good bill * * * It would bring the Bevo and Coca Cola people here." He further said, "Ben Peebles could get next to them." Burgess also testified, "Defendant said that he had a man he could get next to. I asked him who he was; he said, Ben Peebles."

One of the witnesses who was interested in the soft drink business testified in part that, "We met at 10 next morning at Peebles' office, Burgess being arrested the evening before. Powell said, 'Well, boys, I don't think that I would bother over the matter any more. Burgess has been arrested and unless the Governor puts another man behind the bill you need not give yourself any uneasiness.' "

The above testimony of Burgess to the effect that appellant claimed he had a man by the name of Peebles through whom he could get next to the people who were interested in the soft drink business, tends to prove that Peebles was appellant's agent. And the testimony of witness Leiser to the effect that he told appellant that Peebles wanted to handle the bill and had told witness to see Powell and that he (Powell)' would handle the matter and that upon communicating to. appellant what Peebles said appellant replied, "Well, that's all right," tends to corroborate the testimony of Burgess.

The testimony all taken together tends to prove that appellant designated Peebles as his emissary to those interested in the soft drink bills and that he was authorized to speak for and represent appellant with these parties concerning his ability to defeat or kill legislation which was adverse to their interest.

The ruling of the court therefore was correct in admitting the testimony tending to show the declarations of Peebles concerning Powell's connection with and interest in the pending soft drink bills.

The court instructed the jury at the request of the appellant that they were not authorized to find the existence of a conspiracy from anything that Peebles may have said or done in Powell's absence and without his knowledge. And further that unless Peebles was acting as an agent of and with the knowledge and consent of appellant and by his authority in making statements in the conversations testified to by witnesses Leiser, Bellingrath, and Scott, that they could not consider any statement made by. Peebles as evidence against appellant.

There was no prejudicial error to appellant under the instruction of the court in admitting the testimony as to the declarations of Peebles.

Over the objection of the appellant the court permitted witnesses to testify that during the last Legislature liquor in large quantities was kept in rooms 404 and 406, Marion Hotel; that card games and crap games were played there. One witness testified that it was

noisy and that he stopped games in both rooms at different times. He listened at the door and heard chips rattling. Another witness testified that they kept from a quart to a barrel of beer all the time.

One witness stated, "There was a great deal of time a card-game and most of the time a crap game, any amount from five cents to a hundred, or two or three hundred dollars."

The assistant manager of the Marion Hotel testified that rooms 404 and 406 were connecting rooms and that the rents for these rooms, during the sitting of the last Legislature, was paid by the appellant. Room 404 was rented for the use of the appellant and a close friend of his, and room 406 was occupied by three senators; that the rooms were used interchangeably.

Over the objection of the appellant, Burgess, among other things testified, "Appellant supported Senator Sims for president of the Senate; that Powell stated in his office, in the State Bank building, in the presence of fourteen or fifteen senators, that he had $500 for one vote for Senator Sims if they could get it. He further said that the crowd if they would stick together could pass or kill anything, and that he hoped they would pass drastic railroad and corporation legislation; that he expected to open rooms at the Marion Hotel in a few days where they could meet. Burgess further testified that the doors between rooms 404 and 406 were usually open.

One of the senators testified that room 404 was just a wagon yard for anybody that wanted to come from anywhere in Arkansas. Visiting attorneys and constituents came there for any purpose, just made it their headquarters. Prominent lawyers from all over the State as well as from Little Rock came there.

Powell in his testimony admitted that he had instructed his friend to rent a room at the Marion Hotel, the expenses of which were shared jointly, and stated that the room was intended as a place where they could meet their friends and members of the Legislature. He denied that there was any rough house there; said many

of the visitors brought some liquor which they drank, but that no one complained of any noise, and he never saw any gambling; would not have permitted it, and that the men who did drink a little whiskey there were among the best men in the State.

(5)   The State having adduced testimony tending to prove that Powell rented the rooms 404 and 406, and that he was maintaining the same as a lobby during the sitting of the Legislature, for the purpose of influencing legislation, the testimony tending to show who occupied and visited the rooms and how the rooms were used and the manner and conduct of those who from time to time assembled there was competent.

When the above testimony was offered, and objected to, the court expressly told the jury that the testimony was admitted for the purpose of showing the surroundings of defendant at the time and the associations he had with people who congregated there; "to show what kind of a place it was, to shed light as to whether or not the charge made in this case was true."

The court also in its instructions told the jury that the sole question for their consideration was as to appellant's guilt of the identical charge in this particular indictment; that it made no difference what opinion or suspicions the jury might have of other matters or charges brought out in the testimony which might or might not reflect upon Powell, that they could only consider this testimony in so far as it reflected on the truth or falsity of the charges made against him.

(6)   "Conspiracy," says 5 R. C. L., sec. 37, p. 1088, "need not be established by direct evidence but may and generally must be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purposes to be accomplished."

The testimony on behalf of the State would have warranted the inference that the suite of rooms at the Hotel Marion were maintained by appellant, during the sitting of the Legislature, as a rendezvous for legislators and others who might be concerned in bills, that were to

be introduced as a part of the general plan or scheme of extorting money from certain persons or class of persons.

If appellant and his alleged confederates designed to fleece certain individuals or classes by proposing or enacting bills in the manner charged in the indictment and the maintenance of a lobby at the Marion Hotel was considered by them as essential to the consummation of their conspiracy, then the testimony tending to show the character of these rooms, their equipment, the liquors that were kept there, the games that were played, and all other contrivances that were designed for the purpose of inveigling intended victims into the meshes thus laid for them was certainly competent.

Mr. Greenleaf says: "The evidence in proof of a conspiracy will generally, from the nature of the case, be circumstantial." 3 Greenleaf on Evidence, sec. 93, p. 101.

Likewise, the testimony was competent which tended to prove that appellant said he had $500 for one vote for Senator Sims for president of the Senate, and also the testimony that he said in the presence of fourteen or fifteen senators that if they would stick together they could pass or kill anything and he hoped that they would pass drastic railroad and corporation legislation. This testimony, in connection with the other evidence, tended to show that appellant was attempting thus early to try to lay the foundation for a program of proposed corrupt legislation which contemplated a saturnalia of extortion against railroads, other corporations, and classes of persons engaged in special lines of business.

(7) The State proved by one of the grand jurors, who was the clerk of that body, that the testimony before the grand jury disclosed that there were other persons connected with the conspiracy charged in the indictment whose names were unknown to the grand jury. Appellant's counsel asked the right to put every member of the grand jury on the witness stand. The court refused to grant the request. Appellant excepted to the ruling of the court in not allowing him to call another member of

the grand jury. There was no error in this ruling of the court.

Counsel for the appellant did not disclose to the court what he expected to prove by the other members of the grand jury, or that other members of the grand jury would testify to a different state of facts from that shown by the testimony of the grand juror already adduced. True the court informed the attorney that there was no necessity of his making a statement as to why he wanted the testimony. But, notwithstanding this fact, if appellant desired to challenge here the court's ruling, he should have set forth and presented to the trial court what he expected to prove by the other grand jurors. Even if appellant would have had the right to call the other grand jurors, (which we do not decide), he does not make it appear, in the absence of a showing that their testimony would have been in rebuttal of the testimony of the grand juror already adduced, that he was prejudiced by the court's ruling. Every member of the grand jury, for aught that appears to the contrary, may have testified the same as the juror whose testimony was admitted. *Meisenheimer* v. *State,* 73 Ark. 407; *Fowler* v. *State,* 130 Ark. 365, 197 S. W. 568.

(8) The instructions of the court were correct. They fully covered every phase of the case presented by the evidence, and it would serve no useful purpose and would necessarily extend this opinion to great length to comment upon them in detail. The principal objection urged by appellant is to instructions five and six given at the request of the State, which in effect told the jury that while it is necessary in order to establish a conspiracy to prove that there was a corrupt agreement as alleged in the indictment, yet it is not necessary that this be proved by direct or positive testimony, but that the same may be proved by circumstantial evidence and that the jury may regard the same as proved if they believe beyond a reasonable doubt that the parties charged were actually pursuing in concert the unlawful object stated in the indictment, whether acting separately or together or by

common or different means providing all were leading to the same unlawful results.

These instructions conformed substantially to the law as announced by this court in *Chaplin* v. *State*, 77 Ark. 444, where quoting Mr. Underhill on Crim. Ev., we held:

"Direct evidence is not essential to prove conspiracy. It need not be shown that the parties actually came together and agreed in express terms to enter into and pursue a common design. The existence of the assent of minds which is involved in a conspiracy may be, and, from the secrecy of the crime usually must be, inferred by the jury from the proof of facts and circumstances which, taken together, apparently indicate that they are merely parts of some complete whole. If it is proved that two or more persons aimed by their acts toward the accomplishment of the same unlawful object, each doing a part, so that their acts, though apparently independent, were in fact connected and co-operative, indicating a closeness of personal association and a concurrence of sentiment, a conspiracy may be inferred, though no actual meeting among them to concert means is proved."

We find no reversible error in the record and the judgment is affirmed.