BREYSACHER *v*. STATE.

Opinion delivered March 20, 1916.

1. CRIMINAL LAW—SPECIAL GRAND JURY—ENTERING ORDER.—The entering of the order calling a special grand jury, upon the record of the court, instead of on the judge's docket is a substantial compliance with the statute.

2. CRIMINAL LAW—ORDER SUMMONING SPECIAL GRAND JURY—CLERICAL MISPRISION.—The order of court summoning a special grand jury, when designated as a "*scire facias*," instead of a "*venire facias*," is merely a clerical misprision, and does not affect its validity.

3. CRIMINAL LAW—HOMICIDE—EVIDENCE OF INTENT—STATE OF MIND OF THE ACCUSED.—In a prosecution for homicide, evidence of a proposition by certain employees of a lumber mill, to pay the fine of one of their number if he gave accused a whipping, which was brought to accused's attention, is incompetent, when there was no connection between the affair and the deceased, the evidence being calculated to show that defendant was in a quarrelsome frame of mind a short time before the killing.

4. EVIDENCE—DEPOSITIONS—FORM—CRIMINAL CASE.—Depositions in a criminal case are inadmissible, where they had no caption showing the style of the case in which they were to be used, and when the certificate of the officer, before whom they were taken, did not comply with the statute.

5. CRIMINAL LAW—ADMISSIONS OF INCOMPETENT TESTIMONY—REVERSAL.— —SENTENCE FOR LOWER CRIME.—Defendant was sentenced to twenty-one years in the penitentiary for the crime of homicide. Incompetent evidence on the issue of intent was admitted by the court. The cause was reversed with leave to the Attorney General to have defendant sentenced for voluntary manslaughter, the evidence warranting the same, and the error going only to the question of malice.

Appeal from Mississippi Circuit Court, Chickasawba District; *W. J. Driver*, Judge; reversed.

STATEMENT BY THE COURT.

At a regular term of the circuit court of Mississippi County, the prosecuting attorney petitioned the court for an order impaneling a special grand jury to inquire into the killing of one Johnny Bryeans which occurred after the regular grand jury had adjourned. The court granted the petition and issued an order, which is designated as a *scire facias,* to the sheriff of Mississippi County, commanding him forthwith to summons from the body of the

electors "sixteen good and lawful men to serve as members of the grand jury." The clerk entered the order upon the circuit court record and issued an order directed to the sheriff, commanding him to summons "from the body of the Chickasawba District of Mississippi County sixteen good and lawful men," etc., to act as special grand jurors. The jury was duly impaneled and returned an indictment against the appellant, charging him, in correct form, with the crime of murder in the first degree in the killing of one Johnny Bryeans. The appellant was convicted of murder in the second degree and his punishment fixed by the sentence and judgment of the court at twenty-one years in the State penitentiary, from which he duly prosecutes this appeal. Other facts will be stated in the opinion.

*C. A. Cunningham* and *Gravette & Rodgers,* for appellant.

1. The court erred in overruling the motion to quash the indictment. Kirby's Digest, § 2219. Power to order special terms of court and special grand juries is purely statutory and the law must be strictly complied with and must appear of record. 176 S. W. 165; Kirby's Digest, § 2219; 100 Ark. 375; Kirby's Digest, § § 1532-3, 2219.

2. The court erred in permitting witnesses to testify as to the conversations and transactions between them and defendant prior to the killing and in permitting counsel to examine defendant as to what took place between him and the witnesses. The only object was that of placing a neighborhood squabble before the jury in an attempt to affect the jury by extrinsic facts upon which to base a motive for the killing, and to show the condition of defendant's mind at the time he fired the shot. It was incompetent. 82 Ark. 58. The threats were too remote and indefinite to become a part of the *res gestae.* 73 Ark. 152; *Ib.* 407; 70 *Id.* 610; 52 *Id.* 303; 180 U. S. 356; 82 *Id.* 58; 21 A. & E. Enc. Law, (2 ed.) 219-20.

3. The depositions as to good character and reputation of Schatz should have been admitted. 40 Cyc. 2563, 2463; 104 Tenn. 74; 78 Am. St. 913; 74 *Id.* 145. The

general rule governing the admissibility of testimony to sustain the general character of a witness for truth and veracity is accurately stated in 20 Vt. 554; Underhill on Ev. § 352; 2 Elliott on Ev. § 995; Wigmore on Ev. § 1104; 24 S. W. 1078; 10 So. 621; 29 Ind. 555; 26 Am. St. 350; 38 Md. 15; 18 So. 912; 49 Ala. 650; 42 S. E. 853; etc.

*Wallace Davis,* Attorney General and *Hamilton Moses,* Assistant, for appellee. *J. T. Coston,* of Counsel.

1. There is no error in the order impaneling the special grand jury. The order was properly made and entered of record. Kirby's Digest, § § 606, 4475. The calling it a *scire facias* instead of a *venire* is immaterial; it contained all that was necessary. The clerk is merely the secretary who does the work of a judicial officer. 9 Humph. 626; 15 Cal. 328; 14 Ga. 43; 73 Ind. 537.

2. The testimony of Potts, Owens and Burns was competent. 50 Atl. 1078; 1 Wigmore Ev. § 364; 82 S. W. 201; 4 Ark. 62; 13 *Id.* 236; 92 S. W. 1123; 2 Ark. 244, etc.

3. The depositions were rightfully excluded. They have no caption, nor style of case and they are not properly certified. Kirby's Digest, § 3185.

4. The crime was atrocious. Defendant had a fair trial under proper instructions. He was fortunate in escaping a verdict of murder in the first degree.

WOOD, J. (after stating the facts). Appellant contends that the court erred in overruling his motion to quash the indictment because the order calling for a special grand jury was not entered on the minutes of the court and was directed to the clerk instead of the sheriff, and because it was designated a *scire facias* instead of a *venire facias.* There is nothing in any of these objections.

(1) The statute* provides: "If any offense be committed or discovered during the sitting of any court after the grand jury attending such court shall have been discharged, such court may, in its discretion, by an order to be entered in the minutes, direct the sheriff to summons a special grand jury." The

*Kirby's Digest, § 2219 (Reporter).

entering of the order upon the record of the court instead of on the judge's docket was a substantial compliance with the statute. It was the purpose of the lawmakers simply to have the order entered upon the official record of the court. That is the meaning of the word "minutes," as used in the statute.

(2) Designating the order as a "*scire facias*" instead of a "*venire facias*" was a mere clerical misprision. The order itself was directed to the sheriff, and commanded him to "forthwith summons from the body of electors of this district sixteen good and lawful men to serve as members of this special grand jury," which showed that it was a *venire facias*. It was wholly immaterial what the order was called since the purpose of the order was clearly stated therein, and was understood by the officer and complied with. The clerk was directed to issue the order, but the order itself was by him issued to the sheriff. The proceedings were in all things regular, and the court did not err in overruling the motion to quash the indictment. See *Dawson* v. *State,* 121 Ark. 211.

The appellant was one of the bosses in the employ of the Chicago Mill & Lumber Company. Bryeans was permitted to haul wood from the mill and supply the mill employees and its officers and such other persons as he cared to. When there was a surplus of wood at the mill it was sold to anybody who wanted it. It was a rule of the company not to allow anyone to bother the men who were employed at the mill or to talk to them while they were at work. Bryeans, it appears from the testimony, had been violating this rule and appellant had remonstrated with him about it, and on the day of the killing appellant approached him again, as he stated, to protest against his further interference with the employees at the mill and that it was during this conversation that the killing occurred.

Appellant relates the occurrence as follows:

"As I came out I met Mr. Schatz at the door and asked him to go to the boiler room with me. On the way over I saw Johnny Bryeans and told Mr. Schatz I wanted

to speak to him. It was the first opportunity I had had. I walked up to him as he was pulling the back off of his wagon under the kindling shed, and said, "Johnny, I want you not to bother that negro any more about bringing wood out. Come to Mr. Davidson or me and we will see that you get it.' He replied, 'I have not been bothering any of the men.' I said, 'You will have to keep your driver out of here, and the other evening you were bothering the men and it is against the rule. I do not want it done.' He said he had not been bothering the men. Mr. Schatz stepped between us and said there was no need for trouble. I thought at the time that Bryeans was going after his knife, but did not think that there would be any trouble. I told him every time he came into the shop he stopped and talked to Skinny Morgan and he called me a God-damned-liar, and I called him another one, and he put his hand in his pocket, got his knife and ran at me from a distance of about five or six feet. I backed away but got my foot tangled in some trash and kindling, saw that I could not get away from him, pulled my pistol and shot him. I could tell by the look in his eye that he was going to cut me. I had no intention of killing him. If I could bring him back by serving a term in the penitentiary I would gladly do so."

This testimony of appellant as to what took place at the time of the fatal rencounter was substantially corroborated by witness Schatz, who was in company with appellant at the time he approached Bryeans, and also witness Stinnett, who was nearby and observing them.

On behalf of the State a witness testified as follows: "I was something like forty-five or fifty feet away. Mr. Bryeans was facing Mr. Breysacher and Breysacher's back was to me; Mr. Schatz was leaning against the back of a wagon. I saw Mr. Breysacher step back about one step and fire. Mr. Bryeans did not fall for about a minute, and I thought he had missed him. At the time the shot was fired Mr. Bryeans was standing facing towards Mr. Breysacher with his hands at his sides. He stood in that position until he weakened down." Witness

went to where Bryeans was lying and saw no weapon. They were five or six feet apart when the shot was fired. Witness was in a position to see Bryeans and could have seen same if he had had a knife in his hand. However, he was not expecting any trouble and did not remember having seen any knife. Witness stated that he himself was very much excited, and did not know whether he saw any movements or not. Did not pretend to say Mr. Bryeans did not have a knife, he might have had one but witness did not see it.

One other witness testified that he was about sixteen feet from Bryeans when the dispute between him and appellant arose. He could not hear what was said. Immediately after they stepped back from the wagon Bryeans started towards Breysacher. As he started Breysacher reached back, but witness did not see him put his hand in his pocket and bring it out. He had a gun. Bryeans turned around, sank to his knees and fell over. Witness could see his hands and he did not have any knife. Witness never saw Breysacher's pistol; just saw the motion of his arm. Witness had his eyes on Bryeans at the time, and was looking at him at the time to see if he put a knife in his pocket and he didn't do it. His hands were down at his sides, and he never moved them.

Another witness testified that he saw Bryeans advance towards Breysacher a couple of steps; could not say that he was doing anything at the time he was shot. He stepped back and dropped his hands to his sides; never put his hands to his pockets. Witness did not see any knife.

Other witnesses on behalf of the State whose attention was called to the occurrence by the pistol shot testified substantially to the effect that the participants seemed to be standing perfectly still; that Bryeans' hands were hanging by his sides. They did not see him put his hands in his pocket from the time he was shot until he sank down. They could have seen the knife if he had had one in his hands. One witness testified, "At the crack of the pistol I looked up and saw Mr. Gus (Brey-

sacher) standing with it (the pistol) in his hand. Mr.
Bryeans was standing ten feet away, with both of his
hands by his side. I could see his hands distinctly;
he did not have anything in them. Another witness
testified substantially to the same effect.

The above testimony presents the circumstances of
the fatal rencounter from the view point of the appellant
and the State.

A witness by the name of Potts testified that prior
to the 3rd of April he had been employed by Bryeans
and before that day Bryeans had discharged him, and
told witness at the time that he did so because Gus
Breysacher said witness was bossing the negroes too
much. The evening before the killing witness was with sev-
eral boys in the barber shop and they agreed among them-
selves that if the witness would whip Breysacher they
would pay witness' fine. Some of the boys were em-
ployees at the mill. Over the objection of appellant,
witness was permitted to testify that he stopped Brey-
sacher while he was on his way to dinner and asked him
why he told the damn lie on witness; that Breysacher
replied "If you think I told a damn lie on you get Johnny
Bryeans and bring him up and I will convince you that
I did not."

Another witness testified that about 12:30 o'clock on
the day of the killing he had a conversation with Brey-
sacher, and, over the objection of appellant, witness was
permitted to state that Breysacher said to witness "When
you get money to donate on anybody else's fine donate
some on mine." Witness told Breysacher that he had
agreed to pay a dollar on Potts' fine, and Breysacher
said that he had not done anything to the boys. Witness
jokingly said that he would pay a dollar towards paying
Potts' fine if he would whip Breysacher. Breysacher re-
plied that he was glad witness did not have any more
than that to do with it, and left witness laughing and in
a good humor. That was 30 or 40 minutes before the
killing.

Another witness was permitted, over the objection of appellant, to state that about five minutes before the killing he had a conversation with Breysacher in which Breysacher had reproached him for offering a dollar on Potts' fine if Potts' would give Breysacher a whipping; that Breysacher said to witness that it was none of witness' business who told him (Breysacher) about it; that Breysacher struck witness and said something to witness that he did not remember. Witness found that he was mad and tried to get loose from him. He got loose and went in the mill and Breysacher caught him again. Witness only regarded what the Potts boy said as a joke, and did not apologize because Breysacher did not give him time. Breysacher said to witness that there were seven more that he was going to see.

Now it was not shown that Bryeans was one of those in the barber shop who offered to pay Potts' fine if he should whip Breysacher, and there is no testimony whatever to connect Bryeans with that conversation; nothing to show that the appellant harbored any ill will towards Bryeans growing out of the occurrence in the barber shop. There was nothing to show that Breysacher had reference to Bryeans when he stated to Albert Burns that there were seven more he was going to see in regard to the proposition to pay Potts' fine. There was nothing to show that there was any ill feeling on the part of Breysacher towards Bryeans before the fatal rencounter.

Breysacher testified that he and Bryeans were good friends; that they had had no difficulty whatever; that there was no ill feeling existing between them and that he had not connected John Bryeans with the conversation in the barber shop and had no intention of mentioning the barber shop occurrence to him at the time he approached him about disturbing the men in the box factory. So the occurrence in the barber shop, which so aroused the temper of the appellant as to cause him to violently attack one of the parties and to declare that he was going to see the others for the same purpose, had no connection

whatever with the matter between Bryeans and appel-
lant out of which the difficulty grew and which resulted
in the death of Bryeans.

(3)    Now the effect of the testimony of witnesses
Potts, Burns and Owens was to show that Breysacher
was in an ill humor, and was harboring ill will towards
those who had participated in the occurrence at the
barber shop when Potts proposed to whip Breysacher,
and the others present agreed to pay his fine if he would
do so; that he was so embittered against them that he
was, on the day of the killing and just a short time before,
engaged in looking them up and calling them to account
for what they had said and the part they had taken in
the proposal by Potts to give him (appellant) a whipping;
that he had gone to the extent of making a violent attack
upon one of them, and had declared that there were seven
more that he expected to see.    The testimony was cal-
culated to cause the jury to believe that the appellant,
upon apparently a very slight provocation, or no provo-
cation whatever, was undertaking to run down and rebuke
or chastise those who he fancied had done him a wrong,
and that in so doing he was manifesting a wicked and
abandoned disposition, and that it was this malice and
bad temper which caused him to assault and slay Bryeans.

In *Deal* v. *State*, 82 Ark. 58, a witness was permitted
to testify that a few hours before the killing the defend-
ant had threatened to shoot his gun until it melted if
they didn't quit running over him.    His threat was not
directed to any particular individual, and the deceased
was not mentioned.    In commenting upon this testimony
we said: "It tended to show a malevolent spirit, a wicked
and abandoned disposition; that appellant was in a frame
of mind fatally bent on mischief which culminated in the
killing of Bronson.    But the testimony was clearly in-
competent, because the threat 'to shoot his gun till it
melted,' made several hours before the tragedy, was not
directed against Bronson, the man who was killed, 'but
against another fellow.'    The proof showed that there
was no ill will between appellant and Bronson before the

killing. On the contrary, they were shown to be on friendly terms." We held in that case that the admission of such testimony was error, citing cases. The principle announced in that case rules this.

(4) The court excluded offered depositions of certain witnesses taken at Cairo, Illinois, to establish the reputation of appellant's witness Schatz for truth and morality. The certificate of the officer taking the offered depositions was as follows: "State of Illinois, County of Alexander. John T. Brown, Cairo, Ill., being first duly sworn, deposes and says that he is the commissioner before whom W. H. Wood was taken in the case of The State of Arkansas, plaintiff vs. J. A. Breysacher, defendant. He also further states that he had no connection, either directly or indirectly, with the said Breysacher." (Signed) John T. Brown, Commissioner."

Our statute provides: "The certificate of the officer shall state the time and place of taking the deposition; that the witness was duly sworn before he gave his testimony, and that his testimony was written, read to and subscribed by him in the presence of the officer; and also state by whom it was written, and which of the parties, in person or by agent or attorney, was present at the examination of the witness." Kirby's Digest, § 3185.

The depositions had no caption showing the style of the case in which they were to be used. The certificate of the officer did not comply with our statute, and therefore the court did not err in excluding the depositions in the form in which they were offered.

(5) The court erred in admitting the incompetent testimony above indicated, and the judgment will be reversed. But it does not follow that the appellant is entitled to a new trial. The only effect of the incompetent testimony was to show malice on the part of the appellant, and the prejudicial effect of this testimony therefore will be eliminated if the verdict is reduced from murder in the second degree to manslaughter. For the jury did not accept the testimony on behalf of the appellant tending to show that he was justified in taking

the life of his fellow man. On the contrary, their verdict shows that they believed the testimony of the witnesses for the State on this issue, and with the incompetent testimony tending to show malice eliminated, it is manifest the jury would not have returned a verdict for a lower offense than that of voluntary manslaughter.

The judgment will therefore be reversed and the cause remanded for a new trial, unless the Attorney General, within fifteen days, shall elect to have appellant sentenced to imprisonment in the penitentiary for voluntary manslaughter.

KIRBY, J. dissents.