ROWLAND v. STATE.

4483                                                     213 S. W. 2d 370

Opinion delivered June 28, 1948.

Rehearing denied October 4, 1948.

*Henry Donham* and *C. Floyd Huff, Jr.*, for appellant.

*Guy E. Williams*, Attorney General, and *Oscar E. Ellis*, Assistant Attorney General, for appellee.

Ed. F. McFADDIN, Justice. This appeal is from a conviction on an indictment for bribery, wherein it was alleged that the defendant (appellant here), Jay M. Rowland, as city attorney of Hot Springs, received money as bribes, to-wit, $50 each month during the years 1945 and 1946 from Otis McCraw, operator of the Southern Club, a gambling establishment; and that said bribes were paid to Rowland with intent to influence his actions and decisions as city attorney pertaining to the ordinance which prohibits gambling. The defendant was indicted under § 3249, Pope's Digest. Some of our cases involving the offense of bribery are: *Watson* v. *State*, 29 Ark. 299; *Chapline* v. *State*, 77 Ark. 444, 95 S. W. 477; *Butt* v. *State*, 81 Ark. 173, 98 S. W. 723, 118 A. S. R. 42; *Value* v. *State*, 84 Ark. 285, 105 S. W. 361, 13 Ann. Cas. 308; *State* v. *Dulaney*, 87 Ark. 17, 112 S. W. 158, 15 Ann. Cas. 192; *State* v. *Bunch*, 119 Ark. 219, 177 S. W. 932; *Sims* v. *State*, 131 Ark. 185, 198 S. W. 883; *Payne* v. *State*, 165 Ark. 229, 263 S. W. 780; and *Barrentine* v. *State*, 194 Ark. 501, 108 S. W. 2d 784. The record here is voluminous;[1] but in the excellent brief for the appellant all the assignments are grouped into six topic headings; and in the oral argument it was agreed that these six topic headings embrace all the assignments. We proceed therefore to list and discuss the six topic headings as contained in the appellant's brief.

I. *Appellant says, "The Grand Jury was Illegally Empaneled and the Indictment is Void."* The City of Hot Springs is in Garland county, which is in the 18th Judicial Circuit. Judge Earl Witt was the Judge of this circuit until December 31, 1946, and was succeeded by Judge C. H. Brown on January 1, 1947. The regular terms of the Garland Circuit Court begin on the fourth Monday in March and September of each year.[2] At the opening of the September, 1946, term, Judge Witt empaneled a grand jury which had been selected by the jury commissioners. This grand jury served only a short time,

---

[1] The transcript contains 694 pages, and another transcript used as an exhibit contains 236 pages. The printed abstract and briefs contain 521 pages. In the motion for new trial there are 92 assignments, and in the motion in arrest of judgment there are 14 assignments.

[2] Section 2832, Pope's Digest.

and in October, 1946, a court order was entered, reading: "The said grand jury, having no further business under consideration, adjourned subject to the call of the foreman of the grand jury or the call of the Judge of this court."

That grand jury was never reassembled. On February 21, 1947, (Judge C. H. Brown having taken office on January 1, 1947, as aforesaid) a court order was entered, dismissing that grand jury; and on March 1, 1947, a court order was entered, directing the sheriff to summon a special grand jury to convene on March 4, 1947. The special grand jury did so convene, and, on March 19, 1947, returned the indictment against the defendant (appellant), on which he was tried in this case.[3]

Appellant claims that the special grand jury was not empaneled in accordance with law, and that the indictment should have been quashed. His motion to that effect was overruled by the court (Judge Cummings presiding) on April 14, 1947. Appellant cites, *inter alia,* Art. II, § 8 of our Constitution, Amendment XXI thereto, and §§ 3798-99, 3829, 3882-4, 3887, 8306-8, 8312, 8326-27, and 8333, Pope's Digest. In addition to textbooks and cases from other jurisdictions, appellant cites the following decisions from this court: *State* v. *Cantrell,* 21 Ark. 127; *Wilburn* v. *State,* 21 Ark. 198; *Harding* v. *State,* 22 Ark. 210; *State* v. *Swim,* 60 Ark. 587, 31 S. W. 456; *Bowie* v. *State,* 185 Ark. 834, 49 S. W. 2d 1049; *Mo. Pac. Transportation Co.* v. *Parker,* 200 Ark. 620, 140 S. W. 2d 997.

We hold that the circuit court had full power to empanel a special grand jury as was done in this case. Section 3004, Crawford & Moses' Digest (being §§ 71-72 of Chap. 45 of the Revised Statutes of 1837), says: "If any offense be committed or discovered during the sitting of any court after the grand jury attending such court shall have been discharged, such court may, in its discretion, by an order to be entered in the minutes, direct the sher-

---

[3] Judge C. H. Brown presided until an exchange-of-circuits agreement with Judge Maupin Cummings, effective April 14, 1947; and Judge Cummings presided (except as shown in Topic VI, *infra*) until the culmination of this case in the circuit court. This will be discussed further in topic VI, *infra.*

iff to summon a special grand jury. The sheriff shall, in pursuance of such order, forthwith summon such grand jury from the inhabitants of the county qualified to serve as grand jurors, who shall be returned and sworn, and shall proceed in the same manner in all respects as provided by law in respect to other grand jurors.''

Under the foregoing statute we held that the summoning of a special grand jury was within the discretion of the court. (See *Davis* v. *State,* 118 Ark. 31, 175 S. W. 1168, and cases there cited; and see, also, *Breysacher* v. *State,* 123 Ark. 101, 184 S. W. 433.) Under the foregoing statute the special grand jury could have been summoned only when an offense had been committed or discovered *''during the sitting of any court after the grand jury attending such court shall have been discharged.''* This restriction, as stated in the italicized quotation last above, was eliminated by § 33 of Initiated Act 3 of 1936 [4] wherein § 3004, Crawford & Moses' Digest, was amended to read: ''At any time a grand jury is not in session, the court, in its discretion, by order entered of record, may empanel a special grand jury. Such special grand jury when empaneled shall have all the powers and proceed in all respects as provided by law for the conduct of regular grand juries.''

The foregoing § 33 of Initiated Act 3 of 1936 is full authority for the calling of the special grand jury in the case at bar. The regular grand jury was ''not in session'': with the approval of the court, in October, 1946, it had adjourned subject to call; also it had been discharged by action of the court on February 21, 1947. So, a special grand jury could have been empaneled.

Appellant says that the special grand jury should have been selected by the jury commissioners, rather than by the sheriff. But we have repeatedly held, as stated by Mr. Justice HART in *Brewer* v. *State,* 137 Ark. 243, 208 S. W. 290: ''Moreover, under our system, there are two modes by which a grand jury may be lawfully

---

[4] The Initiated Act 3 was captioned, ''An Act to Amend, Modify and Improve Judicial Procedure and the Criminal Law, and for other purposes.'' The act was adopted by the People at the General Election in 1936, and may be found on pages 1384, *et seq.,* of the Acts of 1937.

selected. One is where they are selected pursuant to the provisions of the statute; and the other is where the circuit court causes them to be selected in the exercise of its inherent constitutional right. *Wilburn* v. *State,* 21 Ark. 198, and *Straughan* v. *State,* 16 Ark. 37.''

To the same effect is *Edmonds* v. *State,* 34 Ark. 720. The omission, in § 33 of Initiated Act 3 of 1936, of the provision found in § 3004, Crawford & Moses' Digest, to the effect that the court might direct the sheriff to summon the special grand jury, is immaterial, since we had said, in the quotation from Mr. Justice HART above, that the court, in having a grand jury summoned by the sheriff, was acting under its ''inherent constitutional right.'' The existence or absence of a statute—authorizing the court to have the sheriff summon the jury—could make no difference when the circuit court was acting under its inherent constitutional right. So we hold that the circuit court had the power to empanel a special grand jury just as it did in this case.

II. *Appellant says, ''There was an Illegal Discrimination Against Defendant in the Selection of the Special Grand Jury.''* Appellant offered evidence tending to show: (a) that for many years prior to 1946 Hot Springs and Garland county had been under the political domination of the Leo McLaughlin faction of the Democratic party; (b) that appellant was a member of the McLaughlin faction; (c) that in the 1946 state and county Democratic primary there was a contest between the so-called ''G.I. Ticket'' and the ''McLaughlin Ticket''; and (d) that the G.I. Ticket was headed by Judge C. H. Brown, Sheriff I. G. Brown and others (the Browns were not shown to be related). The evidence showed that the feeling ran high between these factions, both in the Democratic primary in August, 1946, and in the general election in November, 1946.

The point here is: the appellant claims that Judge Brown and Sheriff Brown and the prosecuting attorney and other officials—all elected on the G.I. Ticket—willfully and deliberately selected, for the special grand

jury, men known to be hostile to the McLaughlin Ticket, and known to be loyal and devoted adherents of the G.I. Ticket; and appellant claims that there was a violation of his rights, as guaranteed by Art. II, § 8 of the State Constitution, and Amendment XIV of the United States Constitution, in the alleged exclusion*from the special grand jury of all persons except G.I. adherents. In support of his contentions, appellant cites these cases from the U. S. Supreme Court: *Hill* v. *Texas* [5] (on exclusion of Negroes), *Hale* v. *Kentucky* [6] (on exclusion of Negroes), *Thiel* v. *Southern Pacific Co.* [7] (on exclusion of day laborers), and *Ballard* v. *United States* [8] (on exclusion of women); and appellant also cites these cases from other courts: *Carruthers* v. *Reid* [9] (on exclusion of Negroes), *Walter* v. *Indiana* [10] (on exclusion of women), and *Kentucky* v. *Powers* [11] (on exclusion of Republicans). This last-cited case was reversed by the U. S. Supreme Court on the question of jurisdiction.[12]

The opinion by Judge COCHRAN in *Kentucky* v. *Powers, supra,* is the only case to which our attention has been called, wherein has been discussed political affiliation as constituting a distinct classification in the matter of selecting jurors for either grand or petit jury service. This matter of "groups and classifications" could easily be carried to an extreme. To illustrate: if religion be recognized as a basis for classification of our people, as regards selection for, or exclusion from, jury service, then a defendant of the Catholic faith might claim that he had been discriminated against if no Catholics were on the panel of the challenged jury. Likewise, a Protestant might make the same claim if none of his faith was on the challenged jury. Then the major religious groupings might be subdivided. If the defendant were a Meth-

[5] *Hill* v. *Texas*, 316 U. S. 400, 86 L. Ed. 1559, 62 S. Ct. 1159.

[6] *Hale* v. *Kentucky*, 303 U. S. 613, 82 L. Ed. 1050, 58 S. Ct. 753.

[7] *Thiel* v. *So. Pac. Co.*, 328 U. S. 217, 90 L. Ed. 1181, 66 S. Ct. 984.

[8] *Ballard* v. *U. S.*, 329 U. S. 187, 91 L. Ed. 181, 67 S. Ct. 261.

[9] *Carruthers* v. *Reid*, C. C. A., 8th Circuit, 102 Fed. 933.

[10] *Walter* v. *Indiana*, S. Ct. of Ind., 195 N. E. 268, 98 A. L. R. 607.

[11] *Kentucky* v. *Powers*, U. S. District Ct., 139 Fed. 452.

[12] *Kentucky* v. *Powers*, 201 U. S. 1, 50 L. Ed. 633, 26 S. Ct. 387, 5 Ann. Cas. 692.

odist or a Presbyterian, he might make the claim that he had been discriminated against if the challenged panel contained none of his religious faith.

Furthermore, if political affiliation be recognized as a basis for classification of our people as regards selection for, or exclusion from, jury service, then a defendant who is a Democrat might claim he had been discriminated against if no Democrats were on the panel of the challenged jury. Likewise, a Republican might make the same claims if no Republican were on the challenged jury. Then, the Democratic party might be subdivided, into Conservatives v. New Dealers. Furthermore, Democrats in Arkansas might be subdivided on the basis of whom they had supported for Governor in the last primary election; and finally we could get to the situation, as here, where the Democrats of one county—Garland—could subdivide into ''G.I. Faction v. McLaughlin Faction.'' The inevitable contention would be that, in the selection of the jury there had been a discrimination against the class of which the appellant was a member. That is the contention here.[13] We have given the foregoing illustrations to demonstrate how far this ''G.I. Faction v. McLaughlin Faction'' question carries us in the supposed application of the 14th Amendment. If such were ever held, then the United States would become a nation of pressure groups and distinct interests, rather than a nation of free and united people. Our divisions would be emphasized at every turn, rather than our similarities.

But, as interesting as is this contemplation and speculation, we find it unnecessary to pass on the legal question posed—i. e., illegal discrimination—because we hold that the appellant failed to prove that he was discriminated against in any way in the selection of the special grand jury. Each of the 16 persons composing the special grand jury was called as a witness by the appellant on the hearing of the motion to quash. The testimony is contained in 62 pages of the transcript. A careful reading of the record discloses that the special grand jury

[13] There is an annotation on Unfair Practices in Jury Selection in 82 L. Ed. (U. S.) 1053.

was fairly selected, and representative of the business and social and political life of the community. As regards residence: 12 of the jurors lived in Hot Springs and four [14] lived outside the city. Of those living in the city, two [15] had their places of business outside the city. As regards politics: eight jurors [16] had supported a part of the McLaughlin Ticket and part of the G.I. Ticket. Two of the jurors [17] had been election officials approved at the time by the dominant political faction, i. e., the McLaughlin faction. All who were questioned on the point stated that the indictment as returned was based on the evidence presented before the special grand jury, and that their report was true and correct. Sheriff I. G. Brown testified as to how he selected the men for the special grand jury: "I made my selection on a number of things . . . intelligence, reputable businessmen, and their integrity."

The evidence given by the sixteen special grand jurors supports that statement.

Furthermore, the appellant Rowland was not a candidate in the state or county elections in 1946 when the "G.I. Ticket v. McLaughlin Ticket" issue was involved; Rowland was city attorney of Hot Springs, and the date of the city election does not coincide with the state and county elections. No member of the special grand jury was asked whether he knew or had ever heard of Rowland, or what faction Rowland supported, or what faction supported Rowland. Certainly, in the record before us, Rowland has made no showing of any illegal discrimination. This finding—based on the facts presented—makes it unnecessary for us to decide (1) the posed legal question as to whether political factionalism in a county race could be seized upon by a city official to quash an indictment on the basis of illegal discrimination; and (2) the interesting legal question as to whether the right of the prosecuting attorney to proceed by information, under

[14] These four were: Brenner, Pennington, Biles and Connelly.

[15] These two were: Craig and Duncan.

[16] These eight were: Hogaboom, Pennington, Lewis, Craigo, Duncan, Givens, Biles and Clark.

[17] These two were: Givens and Burgess.

Amendment XXI of the Arkansas Constitution, has made obsolete and outmoded the entire question of illegal discrimination in the selection of a grand jury. We affirm the action of the trial court in refusing to quash the indictment.

III. *Appellant says, "The Demurrer to the Indictment Should Have Been Sustained."* The indictment reads: "The grand jury of Garland county, in the name and by the authority of the State of Arkansas, accuse Jay M. Rowland of the crime of accepting and receiving bribes committed as follows, to-wit: The said Jay M. Rowland in the county and state aforesaid, being then City Attorney of the City of Hot Springs, a place of profit and trust under the laws of the State of Arkansas, unlawfully, feloniously, and corruptly accepted and received:

"Money and bribes, to-wit: $50 per month each month in the years 1945 and 1946 from Otis McCraw, Sr., and J. O. McCraw, operators of the 'Southern Club Book,' Hot Springs, Garland county, Arkansas, a bookmaking and gambling establishment. The money and bribes were paid to Jay M. Rowland for himself and Leo P. McLaughlin with intent to influence Rowland's actions and decisions as city attorney, pertaining to state laws and ordinances of the City of Hot Springs, Arkansas, which prohibit gambling and the operation of gambling houses insofar as they applied or might apply to Otis McCraw, Sr., J. O. McCraw, or the 'Southern Club Book.' Such money and bribes, totaling $1,200 during the years 1945 and 1946, were paid to Jay M. Rowland for himself and Leo P. McLaughlin, against the peace and dignity of the State of Arkansas."

Appellant says the indictment fails to state an offense, and in his brief, uses this language: "The defect in the indictment is its failure to allege that the defendant received money with the intent that his actions and decisions as city attorney be thereby influenced. The indictment does allege that money was paid with such intent. In other words, it alleges that McCraw intended to influence Rowland's actions by paying the money, but

it wholly fails to allege that Rowland accepted the money with the requisite criminal intent.''

In support of his contention, appellant cites, *inter alia*: *Sims* v. *State,* 131 Ark. 185, 198 S. W. 883; *Myers* v. *State,* 168 Ark. 498, 270 S. W. 959; *Williams* v. *State,* 93 Ark. 81, 123 S. W. 780; *Davis* v. *State,* 80 Ark. 310, 97 S. W. 54; *U. S.* v. *Hess,* 124 U. S. 486, 8 S. Ct. 571, 31 L. Ed. 516; *Pettibone* v. *U. S.,* 148 U. S. 197, 13 S. Ct. 542, 37 L. Ed. 419.

The appellant was indicted under § 3249, Pope's Digest, which may be epitomized, insofar as the question now presented is concerned, as follows: ''If any person shall, . . . give . . . any money . . . or any other valuable thing whatever, to any . . . person holding any place of profit or trust, under any law of the state, . . . with intent to influence his . . . decision on any question, matter, cause or proceeding which may . . . be brought before him in his official capacity, . . . and shall be convicted thereof, such person so . . . giving . . . any such money . . . or other valuable thing . . . and the . . . officer or person who shall in any wise accept or receive the same or any part thereof, shall be liable to indictment . . . ''

A careful study of the section discloses that there is no language in the statute concerning the *intent* of the bribe receiver. This is evidently true, because the word ''bribe'' carries with it the necessary meaning that it is to influence the conduct of the recipient. Webster's New International Dictionary, 2d Ed., 1944, defines bribe as: ''A price, reward, gift or favor bestowed or promised with a view to pervert the judgment or corrupt the conduct of a person in a position of trust, as an official or voter.''

Bouvier's Law Dictionary defines bribe: ''The gift or promise, which is accepted, of some advantage as the inducement for some illegal act or omission . . . ''

In *Watson* v. *State,* 29 Ark. 299, in discussing bribery, we said: '' 'Bribery . . . is where a judge or

other person concerned in the administration of justice takes any undue reward to influence his behavior in office.' 4 Black Com., 139. And Russell says: 'Bribery is the receiving or offering any undue reward by or to any person whatsoever, whose ordinary profession or business relates to the administration of public justice, in order to influence his behavior in office, and incline him to act contrary to the known rules of honesty and integrity.' 1 Russ. on Crimes, 154; 1 Hawk. P. C., 414.''

Since the indictment charged the defendant with accepting a *bribe*, that word, in itself, carried the necessary and obvious implication that the bribe influenced his conduct. Of course, at the trial it was necessary for the State to *prove* that the defendant received the money with the intent to influence his actions and decisions as city attorney in regard to the ordinance of the City of Hot Springs prohibiting gambling and the operating of gambling houses. The court so instructed the jury in instruction No. 10.[18] But in the indictment it was not necessary to do more than to follow the statute. See *Lemon* v. *State,* 19 Ark. 171; and *State* v. *Hooker,* 72 Ark. 382, 81 S. W. 231, and cases there cited. A comparison of the indictment with the statute shows most conclusively that the indictment was framed in accordance with the statute.[19] Therefore the trial court correctly overruled the demurrer to the indictment.

IV. *Appellant says, ''The Evidence is Insufficient to Support the Verdict.''* We briefly review some of the evidence. The defendant became city attorney of Hot Springs in April, 1944, and continued as such official until after 1946; during each month of 1945 and 1946 he received $50 from Otis McCraw. This was paid openly. For many years prior to December 28, 1946, McCraw had owned and operated gambling businesses; and one such place was the Southern Club. McCraw admitted that he operated gambling establishments, and that he knew these were illegal; he testified: ''Q. You stated that you paid him these checks openly. You ran your—did you

---

[18] The germane portion of this instruction is copied in Topic V, *infra*.

[19] See, also, § 22 of Initiated Act No. 3 of 1936.

run your gambling business openly? A. Yes, sir. Q. You knew gambling was illegal, didn't you? A. Yes, sir."

Beginning in 1942 the Southern Club was subject to raids by the state police, who—on such occasions—destroyed the equipment, and undertook to confiscate any money found at the gambling establishment. Then it was that McCraw employed the appellant to represent him at the fee of $50 per month for the Southern Club. Rowland was not city attorney at that time, but became such in 1944; and his employment by McCraw continued through 1945 and 1946. As to why he employed Rowland, McCraw said: "Q. But you did expect him to represent you down here in the courthouse? A. Well, I wanted him to just look after these things down there. Q. You wanted him to look after those things in the event your employees were arrested? A. Yes. Q. Or in the event you were arrested? A. Yes. Q. Now, did that same agreement carry over when you hired him at the Southern Club? To pay him $50 monthly? A. The same thing. Q. Same understanding? A. Same understanding. Q. And in the event of raids, he was to represent you and the rest of your employees who were representing you? A. Yes— same as he had been doing right along. Q. The same as he did for you at the Ohio?[20] A. Yes, sir."

The ordinance of the City of Hot Springs of March 4, 1886, prohibited gambling. Section 1 reads, in part: " . . . That every person in the corporate limits of the City of Hot Springs who shall set up, keep or exhibit any gaming table or gambling device . . . shall be deemed guilty of a misdemeanor . . . "

Section 2 reads, in part: "That every person, who shall either directly or indirectly be interested or concerned in any gaming prohibited by the first section of this ordinance, . . . shall be guilty of a misdemeanor . . . "

Section 5 reads, in part: "That every person who shall, within the corporate limits of the City of Hot

[20] The Ohio Club was another gambling house operated by Mc-Craw; but this present indictment concerns payments involving only the Southern Club.

Springs, exhibit any game, . . . instrument or thing, wherein or whereby money may be won or obtained, shall be deemed guilty of a misdemeanor.''

Section 7 says of gambling houses: '' . . . it shall be lawful for the mayor or chief of police, or any of the policemen of said city, to enter or cause the same to be entered by force, by breaking doors or otherwise, and to arrest, with or without warrant, all persons found therein.''

McCraw testified that neither he nor any of the employees at his gambling houses were ever arrested by the municipal authorities for violation of the gambling ordinance.

That the position of city attorney is a place of profit or trust under the law of Arkansas is shown by the fact that the office of city attorney was created by the Legislature (§ 9819, Pope's Digest, and see *State* v. *Bunch,* 119 Ark. 219, 177 S. W. 932.) Adverting then to the epitomizing of § 3249, Pope's Digest, as shown in the previous topic, we have a situation wherein a person (McCraw) gave money to a person (Rowland) holding a place of trust (city attorney) under the law of the State; and the result was that neither McCraw nor any employee of his gambling house was ever arrested for violating the city ordinance against gambling. These questions remain: (1) whether McCraw paid Rowland the $50 per month ''with intent to influence his decision'' as city attorney in enforcing the gambling ordinance; (2) whether the $50 per month influenced Rowland's conduct; and (3) whether Rowland was under any duty to enforce the gambling ordinance. As to (1) and (2), the record is voluminous. Evidence of numerous facts and circumstances was presented as bearing on each of these. Without lengthening this opinion, we conclude that a jury question was presented as regards the intentions of Mc-Craw and the conduct of Rowland.

We come then to the question as to whether Rowland was under any duty to enforce the previously mentioned **ordi**nance of the City of Hot Springs against gambling.

Appellant argues that he, as city attorney, was under no duty to prosecute McCraw, and therefore his failure to prosecute was not a violation of any duty; and from this —appellant argues—the alleged bribe did not influence him in any official duties. Appellant cites § 9819, Pope's Digest, (an act of 1893) on the duties of a city attorney. This act says that the city attorney: " . . . shall give the bond, perform the duties and receive such salary as is now or may hereafter be prescribed by ordinance in each of said cities . . . "

This act leaves it entirely to the city council in each city to prescribe the duties of city attorney. The State introduced three ordinances of the City of Hot Springs purporting to detail the duties of the city attorney. These were the ordinances of April 21, 1886; February 5, 1896; and March 6, 1896. The ordinance of February 5, 1896, provided, in part: "That it shall be the duty of the city attorney, or an attorney representing him, to be in attendance in police court at each and every meeting of said court . . . "

The ordinance of March 6, 1896, provided, in part, as to the duties of the city attorney: " . . . It shall also be his duty to draft all ordinances, bonds, contracts, leases, conveyances, and such other instruments of writing as may be required by the business of the city, and to furnish written opinions upon subjects of a legal nature submitted to him by the council, and to conduct all law business in which the city may be interested, whenever called upon by the police judge in cases of special importance, and represent the city in its police court. . . . "

Appellant insists that these ordinances disclose no affirmative duty on the part of the city attorney to file prosecutions against persons engaged in gambling. In other words, appellant contends that, under these ordinances, there was no duty on the part of the city attorney of Hot Springs to enforce the gambling ordinance in the police court, unless particularly requested by the police judge.

But, regardless of this contention as to the municipal ordinances, Act 115 of 1929 (now found in § 9585, Pope's Digest) materially broadens the duties of a city attorney, and is the statute that imposed the duty upon the city attorney regarding the enforcement of city ordinances. This statute reads, in part: "If the mayor . . . *or any other elective officer of any city* . . . shall willfully and knowingly fail, refuse, or neglect to execute or cause to be executed any of the laws or ordinances within their jurisdiction, they shall be deemed guilty of nonfeasance in office . . . " (Italics our own.)

It is interesting to note that by Act 54 of 1895 (as found in § 7525, Crawford & Moses' Digest) the penalty for failure to execute the laws, as contained in the above section, rested only upon the mayor or police judge. But by Act 115 of 1929 the Legislature broadened this section so as to make the penalty for failure to enforce the laws rest on "any other elective official." In other words, the language italicized above was added to the statute by the 1929 act; and the effect of this 1929 legislation was to make the city attorney liable for nonfeasance if he "willfully and knowingly failed, refused or neglected to execute or cause to be executed any of the laws or ordinances" of the city.[21] The Legislature created the office of city attorney (§ 9819, Pope's Digest), and had the right to impose duties upon that official, in addition to the duties that the municipal corporation might impose.

The effect of the said act of 1929 was to place on the city attorney the duty to be active in the enforcement of the ordinances of the city; and it was provided that, if he should "willfully or knowingly fail, refuse or neglect to execute or cause to be executed any of the laws or ordinances" of said city, he should be deemed guilty of nonfeasance in office. Thus, a duty rested upon the appellant as city attorney of Hot Springs, because the ordinance

---

[21] One instance, where additional duties were placed on the city attorney by legislative enactment, may be found in § 9945, Pope's Digest, wherein it was made the duty of the city attorney also to be attorney for the civil service commission. Another instance is in §§ 7338 and 9757, Pope's Digest, wherein it was made the duty of the city attorney to be the attorney for all municipal improvement districts in cities of the second class and incorporated towns.

(of March 4, 1886) of that city prohibited gambling and gambling houses. The jury could have concluded from the evidence that the effect of the bribe given by McCraw to Rowland resulted in Rowland's willfully and knowingly failing, refusing and neglecting to execute or cause to be executed the ordinance of Hot Springs against gambling. Therefore, we conclude that there was sufficient evidence to sustain the verdict.

V. Appellant says, "The Court Erred in Admitting Testimony Concerning the Hot Springs Waterworks Purchase." In the course of the trial the State introduced evidence of other transactions in which the appellant had been engaged. One of such transactions related to Rowland's activities in the purchase of the Hot Springs Waterworks by the City of Hot Springs from a public utility which previously owned and operated the waterworks. Mr. Cherry was an investment banker in Little Rock; and he desired to purchase the bonds that the City of Hot Springs would issue if it purchased the waterworks. Accordingly, in 1942, Mr. Cherry employed Rowland to assist in consummating the purchase of the waterworks by the city. Cherry agreed to pay Rowland an attorney's fee of $35,000, and also a "finder's fee" of $15,000 if the city purchased the waterworks. Both amounts were in fact paid to him after the city made the purchase. The "finder's fee" was paid to Rowland on December 12, 1943; and he paid Mr. Moody and Mr. Smith each $5,000 of this "finder's fee"; and it was shown that Moody and Smith were aldermen of the City of Hot Springs, and members of the water committee of the city council.

Furthermore, it was shown that on August 23, 1943, Rowland, styling himself "acting city attorney," filed an intervention for the City of Hot Springs in a proceeding before the Arkansas Department of Public Utilities,[22] wherein was involved the attempt of the utility company to issue bonds on the Hot Springs Waterworks properties. The City of Hot Springs opposed the bond issue by the utility company, and then the city purchased the

---

[22] The Department of Public Utilities is now known as the Arkansas Public Service Commission. See Act 40 of 1945.

waterworks property, and issued its own bonds, which were purchased by Mr. Cherry's investment house. Rowland was authorized by the city council of Hot Springs (of which Smith and Moody were members) to represent the city before the Department of Public Utilities. In short, Rowland "gave" to two city aldermen $5,000 each as "finder's fee" in the waterworks matter; and while Rowland was receiving $35,000 as attorney's fee from Cherry, he was also styling himself "acting city attorney" of Hot Springs in appearing before the Department of Public Utilities.

The purpose of this testimony concerning Rowland's activities and fees in the waterworks matter is fairly obvious—i. e., to show how Rowland had acted in other instances, in order to shed light on his intention in accepting the money each month from McCraw. The trial court limited the effect and scope of such evidence. Instruction No. 10 reads in part as follows: " . . . Testimony of other transactions between the defendant, Rowland, and other persons was offered by the State and admitted by the court, but you are instructed that you cannot consider any testimony as to other transactions between the defendant, Rowland, and persons other than Otis McCraw, Sr., and J. O. McCraw except for the sole and only purpose of assisting you in determining the intent of the defendant, Rowland, and his good faith or honesty of purpose in any transactions he had with Otis McCraw, Sr., and J. O. McCraw. In considering such testimony, you must consider it for that purpose alone, and although you may believe that the defendant, Rowland, may have behaved dishonestly with other persons, you cannot convict him in this case unless you do find and believe beyond a reasonable doubt that he accepted money as alleged in the indictment from Otis McCraw, Sr., and J. O. McCraw with the intent to influence his actions and decisions as city attorney in enforcing ordinances of the City of Hot Springs prohibiting gambling and operating of gambling houses insofar as they might apply to said Otis McCraw, Sr., and J. O. McCraw."

With the limitations as contained in the instruction, we hold that the evidence as to the Hot Springs waterworks was admissible. In *State* v. *DuLaney,* 87 Ark. 17, 112 S. W. 158, Chief Justice HILL said:

"The principle of evidence, that offenses or acts similar to the one charged may be competent for the purpose of showing knowledge, intent or design, is as thoroughly established as the general proposition that other crimes or offenses cannot be shown in evidence against a defendant charged with a particular crime. While the principle is usually spoken of as being an exception to the general rule, yet, as a matter of fact, it is not an exception; for it is not proof of other crimes as crimes, but merely evidence of other acts, which are from their nature competent as showing knowledge, intent or design, although they may be crimes, which is admitted. . . .

"Mr. Wigmore, in speaking of the admissibility of such evidence in charges of bribery, says: 'On a charge of bribery, any of the three general principles—knowledge, intent and design—may come into play. To show knowledge of the nature of the transaction, a former transaction of the sort may serve as indicating an under-standing of the particular transactions. To show intent, another transaction of the sort may serve to negative good faith. To show a general design, a former attempt towards the same general end may be significant.' I Wigmore on Evidence, § 343."

In keeping with the foregoing, it is clear that the trial court was correct in admitting—under the limitations stated in the copied instruction—the testimony concerning the Hot Springs waterworks purchase.

VI. *The Appellant says, "The Trial Court Erred in Overruling Defendant's Motion Suggesting the Disquali-fication of the Judge."* Judge C. H. Brown was the regular circuit judge of the 18th Circuit of which Garland county is a part. The defendant filed his motion suggesting the disqualification of Judge C. H. Brown to preside in the case; and later defendant filed a motion asking

that a special judge be elected as provided by Art. VII, § 21 of the Arkansas Constitution. Judge Brown summarily overruled both of these motions; and then exchanged circuits with Judge Maupin Cummings (regular judge of the 4th Circuit); and Judge Cummings thereafter presided through the entire trial, ruling on the motion to quash (mentioned in Topic I, *supra*) and the demurrer (mentioned in Topic II, *supra*), and all matters thereafter.

There is no suggestion that Judge Cummings was in any manner disqualified; but there is here challenged Judge Brown's right to make the exchange of circuits (under Art. VII, § 22 of the Constitution, and § 2852, Pope's Digest). The appellant says: "A judge disqualified on the grounds of disqualification alleged in this case should not be permitted to select a presiding judge in the case. This should be left to election by members of the local bar, just as the Constitution provides."

The case of *Evans* v. *State*, 58 Ark. 47, 22 S. W. 1026, is enlightening, and is authority against the appellant's contention. Evans was indicted for murder in Union county, and obtained a change of venue to Ouachita county. The regular judge (of the 13th Circuit of which Union and Ouachita counties were parts) was Judge C. W. Smith. He was disqualified in the case because he was related within the fourth degree to the victim of the murder. Judge C. W. Smith effected an exchange of circuits with Judge A. M. Duffie (judge of the Seventh Circuit), who presided through the entire Evans trial. The defendant protested against Judge Duffie presiding, because he had in effect been selected by Judge Smith under the exchange of circuits (under Art. VII, § 22 of the Constitution, and § 1374, Mansfield's Digest). In holding the defendant's objection to be without merit, Mr. Justice BATTLE, speaking for this court, said: "Appellant insisted that Judge Duffie had no right or was disqualified, to preside in his trial because of Judge Smith's relationship to the deceased. How this could disqualify Judge Duffie we are unable to understand. The

Constitution authorized them to temporarily exchange circuits or hold courts for each other for such length of time as seemed to them practicable and to the best interest of their respective circuits and courts. The disqualification of one to preside in causes pending in his court or the impropriety of his so doing might well have been a good cause or reason for the exchange. In exchanging circuits they had the right to fix the time according to what in that respect seemed to them practicable and to the best interest of their respective circuits and courts. When the exchange was made, the law did not limit the right of either to preside in trials to those wherein the regular judge was not disqualified. The disqualification of one did not attach to the other or affect his qualification.''

In the case at bar it is not claimed that Judge Maupin Cummings—who presided throughout all the trial on the merits—was in any way disqualified. So the alleged disqualification of Judge C. H. Brown could not attach to Judge Maupin Cummings. If Judge C. H. Brown had been a litigant, then he could not have selected a judge by exchange of circuits. But Judge C. H. Brown's alleged disqualification was not by reason of being a litigant, so he could effect an exchange of circuits just as he did following the precedent of *Evans* v. *State, supra,* in this case. We therefore hold appellant's contentions under this assignment to be without merit.

Conclusion: Finding no error, the judgment of the circuit court is in all things affirmed.