BROWNING *v.* STATE.

4990                                        346 S. W. 2d 210

Opinion delivered May 15, 1961.

George F. *Edwardes,* for appellant.

*J. Frank Holt,* Attorney General, by *Russell Morton,* Asst. Attorney General, for appellee.

PAUL WARD, Associate Justice. Leonard T. Browning, age 66, was charged with the crime of assault with intent to kill George Alford on July 11, 1959, at the Union Station in Texarkana. The jury returned a verdict against Browning for aggravated assault and assessed as punishment a fine of $750 and 9 months in the county jail, and judgment was accordingly entered. Since we have concluded that reversible error was committed we will confine this opinion primarily to that point.

It is not denied that appellant shot and wounded Alford, but there is a sharp conflict in the testimony of the only two eye witnesses to the shooting as to how the difficulty arose. Alford, the prosecuting witness, in substance, testified: On July 11, 1959, I was the terminal trainmaster, in a supervisory capacity, at the Union Station in Texarkana; I have known appellant, who was under my supervision, for about 17 years — he has an office in the same building; it is my usual daily custom to read a newspaper upstairs after my work is over; while so engaged I saw appellant near by, looking like he was mad, he inquired what I meant by asking if he had been drinking (referring to a previous incident); I told him it was my duty to check the employees and that this was

no time to talk about it; he gritted his teeth and began to punch me in the stomach with a parasol; I grabbed the parasol but he took it away from me; when I reached for my (reading) glasses he pulled a gun out of his pocket and began shooting; I don't know how many times he shot but two bullets hit me. The witness further testified that a Mr. Shellman came running out of the ticket office and grabbed appellant, and then an ambulance came and took him (Alford) to the hospital. Appellant does not deny shooting Alford, but says that Alford provoked the difficulty.

Appellant testified in substance; when I reached the head of the stairs in the station I heard someone call my name, and I saw Alford sitting down near by; he was looking straight into my eyes; I asked if he spoke to me; he looked like he was mad, like he could tear me to pieces; I asked him if he could explain his actions to me lately (referring to a previous incident which he described in detail); Alford got "very hot" and said "you want to talk to me you come to my office"; then I said "you can tell me right here", and then he (Alford) "jumped up from there like he was shot from a spring"; he jumped right in my face and yelled "Browning, I'm going to hurt you"; I was standing at the head of the stairs and was afraid to step back — afraid I'd fall down the concrete steps; when I tried to push him back he put his hands into both pockets — "I'd heard people talk about him pulling a knife"; he didn't stop, and it looked like he was trying to get something out of his pocket; he kept getting closer, and when he wouldn't take his hands out of his pockets I shot him; "I figured that he was coming on me with a knife and I didn't want him to kill me with a knife."

The first witness called by the State was Clyde Sewell, who also worked in the Union Station. He undertook to testify about a conversation which occurred in the building between appellant and others some two months before the shooting, when appellant objected. Thereupon the State's attorney said he expected "to connect up some experience on that date with the

experience of July 11''; and the trial court allowed the questioning to be continued. The witness stated, among other things, that appellant said ''he didn't intend to be pushed around and he had his protection with him, and he showed me a little .25 Colt automatic.'' On cross-examination the witness stated that appellant made no reference in any way to Alford, and that Alford was not discussed ''in any shape, form or fashion.'' Thereupon the following occurred:

MR. EDWARDES: ''Now, may it please the Court, that's not connected up at all and counsel knows its an inflammatory matter and its improper trying to inject it into this case.''

THE COURT: ''Overruled.''

MR. EDWARDES: ''We therefore request that the testimony be excluded.''

THE COURT: ''Overruled.''

MR. EDWARDES: ''Note our exceptions.''

It is our conclusion that the judgment must be reversed for the error indicated above. A similar situation was presented in the case of *Deal* v. *State,* 82 Ark. 58, 100 S. W. 75. Deal was convicted for murder in the first degree. At the trial Thomas Isaac, introduced by the State, was allowed to testify as follows:

''On the afternoon before the killing Pickens Deal was coming down the road, and I spoke to him and asked him concerning a scrap he had had with another fellow. * * * He had his gun with him, and said he intended to shoot it until it melted if they didn't quit running over him. Said he wouldn't be very long about it. He didn't say he was going to shoot any particular fellow. He did not mention the deceased.''

In reversing the case this court stated:

''The testimony of Isaac was therefore prejudicial. It tended to show a general malevolent *spirit,* a wicked and abandoned disposition; that *appellant* was in a

frame of mind fatally bent on mischief which culminated in the killing of Bronson. But the testimony was clearly incompetent, because the threat 'to shoot his gun till it melted,' made several hours before the tragedy, was not directed against Bronson, the man who was killed, 'but against another fellow.' "

The *Deal* decision has been cited with approval in *Washington* v. *State,* 83 Ark. 268, 103 S. W. 617, and *Breysacher* v. *State,* 123 Ark. 101, 184 S. W. 433.

There was also other testimony introduced by the State to show appellant carried a pistol on a previous occasion and that he had previously had some trouble with persons other than Alford. This kind of testimony falls within the category of that heretofore discussed and was likewise incompetent, and should be avoided upon a retrial.

Because of the errors above indicated the judgment is reversed and the cause is remanded for a new trial.